**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-CV-80467-EA**

NEWSMAX BROADCASTING, LLC,

> *Plaintiff,*

v.

FOX CORPORATION and
FOX NEWS NETWORK, LLC,

> *Defendants.*

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 3

      A.      The Market For Right-Leaning Pay TV News ........................................................ 3

      B.      Fox's Dominance Of The Right-Leaning Pay TV News Market ........................... 4

      C.      Fox's Anticompetitive Conduct Harms Competition ............................................ 5

LEGAL STANDARD................................................................................................................. 8

ARGUMENT ............................................................................................................................. 9

    I.      NEWSMAX ALLEGES A PLAUSIBLE ANTITRUST MARKET ............................ 9

      A.      Right-Leaning Pay TV News Is A Cognizable Antitrust Market ........................ 10

           1.      Right-leaning TV news is not interchangeable with other TV news .............. 11

           2.      The complaint adequately alleges pay TV news is not reasonably interchangeable with other media ................................................................... 13

           3.      The complaint adequately alleges the *Brown Shoe* practical indicia .............. 15

      B.      Fox Does Not Demonstrate That The Market Is Implausible.............................. 18

           1.      Fox improperly asks the Court to accept its facts, which do not show that Newsmax's market is implausible ................................................................. 19

           2.      Fox relies on outlier, inapplicable cases ....................................................... 22

           3.      Newsmax's market is well defined.................................................................. 24

    II.      NEWSMAX PLAUSIBLY ALLEGES A SECTION 1 VIOLATION ...................... 26

      A.      Fox's Carriage Agreements Restrict Competition.............................................. 26

      B.      Fox's Conduct Causes Antitrust Injury.............................................................. 28

      C.      Fox Cherry-Picks Facts And Misconstrues Newsmax's Allegations ................... 30

           1.      Supracompetitive pricing and reduced output ............................................... 30

           2.      Fox's secret anticompetitive contract provisions........................................... 31

i

3.       Market foreclosure ........................................................................ 33

4.       Fox's drag-down provisions are not procompetitive discounts ...................... 36

III.     NEWSMAX PLAUSIBLY ALLEGES A SECTION 2 CLAIM ............................... 37

A.       Fox's Monopoly Power And Exclusionary Conduct ............................................ 37

B.       Fox Mischaracterizes The Complaint And Misstates Controlling Law................. 40

IV.      IN THE INTEREST OF EFFICIENCY, NEWSMAX VOLUNTARILY
         WITHDRAWS ITS BLOCK-BOOKING CLAIMS .................................................... 43

V.       NEWSMAX PLAUSIBLY ALLEGES STATE-LAW CLAIMS .............................. 43

CONCLUSION....................................................................................................................... 44

**TABLE OF AUTHORITIES**

**CASES**

*ABS Glob., Inc. v. Inguran, LLC*, 2016 WL 3963246 (W.D. Wis. July 21, 2016) ........9, 10, 19, 23

*Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012) ...................................................................26

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
    592 F.3d 991 (9th Cir. 2010) ........................................................................37

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*,
    99 F.4th 928 (7th Cir. 2024) .........................................................................31

*Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*,
    275 F. Supp. 3d 957 (W.D. Wis. 2017) ..................................................43

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ..............................39, 41

*Associated Press v. United States*, 326 U.S. 1 (1945) ...................................................26

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................8, 42

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ........................28

*Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009) ..................................................................32

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..........................................10, 15

*Carbone v. Brown Univ.*, 621 F. Supp. 3d 878 (N.D. Ill. 2022) .............................................24, 32

*Carter Hawley Hale Stores, Inc. v. Limited, Inc.*, 587 F. Supp. 246 (C.D. Cal. 1984) .................25

*Cass Student Advert., Inc. v. Nat'l Educ. Advert. Serv., Inc.*,
    516 F.2d 1092 (7th Cir. 1975) .......................................................14, 15, 18, 21

*Chicago Professional Sports Ltd. Partnership v. National Basketball Association*,
    961 F.2d 667 (7th Cir. 1992) ........................................................................31

*Colonial Med. Grp. v. Cath. Health Care W.*, 444 F. App'x 937 (9th Cir. 2011) .......................23

*Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974 (7th Cir. 1969) ................................17

*Columbia River Techs. 1, LLC v. Blackhawk Grp. LLC*, 2019 WL 4850168
    (W.D. Wis. Oct. 1, 2019) ...............................................................12, 32

*Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) .............................................28

*DataCell ehf. v. Visa, Inc.*, 2015 WL 4624714 (E.D. Va. July 30, 2015) ....................................25

*Dealer Mgmt. Sys. Antitrust Litig.*, *In re*, 313 F. Supp. 3d 931 (N.D. Ill. 2018) ...........................26

*Deere & Co. Repair Serv. Antitrust Litig.*, *In re*, 703 F. Supp. 3d 862 (N.D. Ill. 2023) ...............38

*Delta Dental Antitrust Litig.*, *In re*, 484 F. Supp. 3d 627 (N.D. Ill. 2020) ................................8, 22

*Deslandes v. McDonald's USA, LLC*, 81 F.4th 699 (7th Cir. 2023) .........................................8, 19

*Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173 (S.D.N.Y. 2006) ..................20

*DSM Desotech Inc. v. 3D Sys. Corp.*, 2009 WL 174989 (N.D. Ill. Jan. 26, 2009).........................43

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F. Supp. 2d 465 (E.D.N.Y. 2005)....................24

*Early v. Bankers Life & Cas. Co.*, 959 F.2d 75 (7th Cir. 1992) ...................................................12

*Estate of Mouradian v. Jackson Cnty.*, 2024 WL 1675039 (W.D. Wis. Apr. 18, 2024)...........9, 42

*Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986)..........................................................9, 10

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980)..............................42

*Fort Wayne Telsat v. ESPN*, 753 F. Supp. 109 (S.D.N.Y. 1990) ........................................... 14-15

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016) ...........................................9

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986)......................................................................29

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ..................................................19

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) ..........................................................12

*Harley-Davidson Aftermarket Parts Marketing, Sales Practices & Antitrust
    Litigation*, *In re*, 151 F.4th 922 (7th Cir. 2025)............................................................18, 23

*Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir. 1980)..............................................30

*Hendershot v. S. Glazer's Wine & Spirits of Okla., LLLP*, 2021 WL 3501523
    (N.D. Okla. Aug. 9, 2021) ...............................................................................................25

*Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir. 1995)..............................20

*Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453 (S.D.N.Y. 2020) ..................................20

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)................................................18, 19, 24

*Hughes v. Northwestern Univ.*, 63 F.4th 615 (7th Cir. 2023)..........................................................33

*Huhta v. Children's Hosp. of Phila.*, 1994 WL 245454 (E.D. Pa. May 31, 1994).........................25

*Hytera Commc'ns Corp. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857 (N.D. Ill. 2022)...............41

*Johnson v. Commission on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2017) ........................25

*Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743 (N.D. Cal. 2022).....................................................10

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)........................................................................22

*Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016).................................................................24

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) .........................................................................41

*Levenstein v. Salafsky*, 164 F.3d 345 (7th Cir. 1998) ..................................................................9, 19

*Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009) ......................23

*Local TV Advert. Antitrust Litig.*, *In re*, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020).............14, 21

*Lorain J. Co. v. United States*, 342 U.S. 143 (1951) ......................................................................26

*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F.4th 337 (7th Cir. 2022).........33

*MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265 (11th Cir. 1999)............................39

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983)..............................27

*McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015).....................................................................34

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) ........................34

*MultiPlan Health Ins. Provider Litig.*, *In re*, 789 F. Supp. 3d 614 (N.D. Ill. 2025)..................9, 10

*My Health, Inc. v. General Elec. Co.*, 2015 WL 9474293 (W.D. Wis. Dec. 28, 2015) ................10

*NCAA v. Alston*, 594 U.S. 69 (2021)...............................................................................................28

*New Orleans Ass'n of Cemetery Tour Guides v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026 (5th Cir. 2023) ........................................................................23

*Nexstar Broad., Inc. v. Granite Broad. Corp.*, 2012 WL 2838547
(N.D. Ind. July 9, 2012) ............................................................................................42

*NFL's Sunday Ticket Antitrust Litig., In re*, 933 F.3d 1136 (9th Cir. 2019) .....................12, 14, 21

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313
(D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987).......................................................20, 21

*Nukote of Ill., Inc. v. Clover Holdings, Inc.*, 2015 WL 13729264
(N.D. Tex. Sep. 10, 2015).............................................................................................22

*Olson v. Champaign Cnty.*, 784 F.3d 1093 (7th Cir. 2015)..........................................................32

*Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997)......................................24, 35

*Paddock Publ'ns., Inc. v. Chi. Trib. Co.*, 103 F.3d 42 (7th Cir. 1996)..........................................34

*Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783 (N.D. Ill. 2022) .............................................21

*Pepsico, Inc. v. Coca-Cola Co.*, 1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) .............................22

*PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8 (D.D.C. 2025)...................................................19

*Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir. 1979).........................15, 17, 18, 21, 22

*Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016)........................................10

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ..............................23

*Republic Tobacco Co. v. North Atl. Trading Co.*, 381 F.3d 717 (7th Cir. 2004) ..........................27

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984)......................................34

*Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510 (7th Cir. 2015)......................12

*Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987).......................................................35

*Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977) .....................................10

*Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538 (D.N.J. 2019)..............................................23

*State v. Waste Mgmt. of Wis., Inc.*, 261 N.W.2d 147 (Wis. 1978)................................................43

*Surescripts Antitrust Litig., In re*, 608 F. Supp. 3d 629 (N.D. Ill. 2022)................................27, 28

*Swanson v. Citibank, N.A.*, 614 F.3d 400 (7th Cir. 2010)................................................................9

*Taizhou Yuanda Inv. Grp. Co. v. Z Outdoor Living, LLC*, 2020 WL 2849966
(W.D. Wis. June 2, 2020) ..................................................................................12

*Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465 (5th Cir. 2000).....................................22

*Text Messaging Antitrust Litig.*, *In re*, 630 F.3d 622 (7th Cir. 2010)..............................31

*Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) ............................................38

*Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821 (N.D. Ill. 2019)...................................9

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ..................................................... 9-10

*United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1 (D.D.C. 2022) ........................... 24-25

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) ...................................30, 31, 41

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)..............................................34, 36

*United States v. Paramount Pictures*, 334 U.S. 131 (1948) ...........................................39

*United States v. U.S. Steel Corp.*, 251 U.S. 417 (1920)................................................22

*Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582 (7th Cir. 2022) ...............................10, 23, 33, 42

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020)..................................8, 27, 37, 43

*Wertymer v. Walmart, Inc.*, 142 F.4th 491 (7th Cir. 2025).........................................21

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)....................................27

## U.S. CONSTITUTION, STATUTES, AND RULES

U.S. Const. amend. I .........................................................................................25, 26

Sherman Act, 15 U.S.C. § 1 *et seq.*.........................................................22, 26, 37, 43

Section 1, 15 U.S.C. § 1.................................................................................26, 36

Section 2, 15 U.S.C. § 2.................................................................................37, 41, 43

Wisconsin Antitrust Act, Wis. Stat. § 133.03(2) .......................................................43

Fed. R. Civ. P. 8............................................................................................32

Fed. R. Civ. P. 8(a)(2)......................................................................................................8

Fed. R. Evid. 201(b).......................................................................................................20


**OTHER MATERIAL**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2d ed. 2002) ...................................................41

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2025) ......................................26, 30, 31, 34, 37

*Cable News Fact Sheet*, Pew Rsch. Center (Sep. 14, 2023), https://www.pewresearch.org/journalism /fact-sheet/cable-news/ [https://perma.cc/GF5S-HBSK]........................................................................................................13

Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81 (2018)............................................8

Mark Jurkowitz & Amy Mitchell, *How Americans Get TV News at Home*, Pew Rsch. Center (Oct. 11, 2013), https://www.pewresearch.org/journalism/2013 /10/11/how-americans-get-tv-news-at-home/ [https://perma.cc/W4HL-UN9E].........11, 21

Leichtman Rsch. Grp., *Research Notes: Actionable Research on the Broadband, Media & Entertainment Industries* (2024), https://leichtmanresearch.com/ wp-content/uploads/2024/03/LRG-Research-Notes-1Q-2024.pdf [https://perma.cc/2QDT-U4RQ] ...................................................................................35

Letters from U.S. House Representatives Anna G. Eshoo & Jerry McNerney to CEOs of cable, satellite, and streaming providers (Feb. 22, 2021), https://docs.house.gov/meetings/IF/IF16/20210224/111229/HHRG-117-IF16-20210224-SD002.pdf [https://perma.cc/WUL8-N2RV]........................................................16

Newsmax+, https://www.newsmaxplus.com [https://perma.cc/4TC4-9CDS] ..............................17

Taylor Orth & Carl Bialik, *Trust in Media 2024: Which news sources Americans trust – and which they think lean left or right*, YouGov (May 30, 2024), https://today.yougov.com/politics/articles/49552-trust-in-media-2024-which-news-outlets-americans-trust [https://perma.cc/S6EZ-2XRL] ........................................13

Brian Stelter, *Trump voters are flocking to a TV channel that claims Biden is not president-elect*, CNN (Nov. 12, 2020), https://edition.cnn.com/2020/11/12/ media/fox-news-newsmax-reliable-sources/index.html [https://perma.cc/ S3M5-LFNY]........................................................................................................16

ix

Emily Tomasik & Christopher St. Aubin, *More Americans prefer to watch the news than read or listen to it*, Pew Rsch. Center (Nov. 20, 2025), https://www.pewresearch.org/short-reads/2025/11/20/more-americans-prefer-to-watch-the -news-than-read-or-listen-to-it/ [https://perma.cc/N8VC-5A2K]................................13, 14

Donald J. Trump (@realdonaldtrump), X (Nov. 15, 2020, at 07:25 AM ET), https://x.com/realDonaldTrump/status/1327950785959915520 [https:// perma.cc/MQ2M-VPXB].........................................................................................16

YouTube TV, https://tv.youtube.com/welcome/ [https://perma.cc/LNV3-89BN].......................17

3 Phillip E. Areeda & Donald Turner, Antitrust Law (1978) .......................................................39

**INTRODUCTION**

Newsmax Broadcasting, LLC ("Newsmax") alleges that Fox Corporation and Fox News Network, LLC ("Fox News" and, collectively with Fox Corporation, "Fox") maintains an illegal monopoly. When Newsmax and others started to provide right-leaning news programming for pay TV, Fox developed a scheme to block or delay their entry and stunt their success. Fox's scheme included restrictive carriage agreements that discouraged distributors from including the new competitors in their most popular tiers. If the distributors agreed to carry Fox's competitors, then Fox ensured they were consigned to disadvantaged placement. Fox also set about to intimidate, disparage, and discredit Newsmax.

The complaint alleges ample motive: Fox didn't want any competitors to gain a foothold in the enormously lucrative market for right-leaning news. Fox didn't want to compete on price, quality, or variety. The complaint quotes internal Fox documents identifying Newsmax and One America News Network ("OAN") as threats. Compl. ¶ 50.

Fox's scheme worked. The complaint details how Fox maintains massive market share, the highest carriage fees, outsized profit margins, and the power to enforce anticompetitive carriage agreements. Fox has stunted the growth of Newsmax and OAN, harming competition, distributors, and viewers as a result.

Fox's motion to dismiss does not meaningfully grapple with these well-pleaded facts. Instead, it attacks a caricature of Newsmax's complaint and advances a factual counter-narrative that relies on cherry-picked statements and documents. Fox improperly invites this Court to adjudicate factual disputes, including America's news watching habits, the degree of substitutability among formats and types of political news, and even whether the complaint accurately describes Fox's agreements. But such factual issues are rarely scrutinized, much less resolved, on the pleadings.

The complaint pleads a straightforward and intuitive market:  right-leaning pay TV news. Fox tries to redefine the market more broadly to include *all* pay TV news and *all* right-leaning content formats.  But the law does not require Newsmax to plead the broadest possible market.

The complaint alleges in detail that Fox wields monopoly power.  Fox charges the highest carriage fees of any programmer, owns an estimated 90% market share, reports extraordinary profit margins, and engages in a suite of anticompetitive behaviors that no other programmer can mimic.  Fox denies these allegations, attributing any financial success to its knack for supplying the best and most popular programming.  Whether Fox is a superior competitor cannot be resolved on a motion to dismiss.

The complaint alleges Fox has long used exclusivity agreements to prevent and delay competition.  Although Newsmax does not yet have access to these agreements (because Fox keeps them secret), the complaint describes how they work and cites numerous examples where the agreements have delayed carriage or forced rivals into disadvantaged tiers.  Fox denies these allegations, asserting that Newsmax misdescribes the agreements.  Or that the agreements may be of harmless short duration.  Or that any exclusivity features are best understood as beneficial discount programs for distributors.  These disputes must await further factual development.

Finally, the complaint alleges that Fox has harmed competitors, competition, and the viewing public.  The complaint details how Fox charges the highest prices, strong-arms distributors, targets and disparages competitors, and forces distributors to carry its less popular programming.  All of this raises prices and reduces choice for distributors and viewers.  Fox disagrees, blaming Newsmax as a business failure trying to litigate its way to success.  For obvious reasons, the issues of antitrust injury, harm to competition, and damages typically

2

involve full discovery and extensive expert testimony.  This Court should deny the motion to dismiss.

## BACKGROUND

### A.      The Market For Right-Leaning Pay TV News

Programmers like Fox and Newsmax license television content to distributors, including those that distribute content for traditional TV – Multichannel Video Programming Distributors ("MVPDs") – and virtual Multichannel Video Programming Distributors ("vMVPDs"), such as YouTube TV and Hulu + Live TV ("Hulu+").  Compl. ¶¶ 23-24.  Distributors, in turn, sell packages (or "bundles") of television channels to consumers.  Carriage agreements between programmers and distributors set the terms on which a distributor may offer a programmer's channels to consumers.  *Id.* ¶ 25.  These carriage agreements typically require distributors to carry a programmer's channels in a specified bundle or "tier."  *Id.*  Basic tiers include widely demanded channels, while more expensive premium tiers can include niche offerings like sports or movie channels such as Showtime.  *Id.*  Distributors generally prefer to carry channels with high demand in their basic tiers, and include channels with lower demand in their less-viewed specialty tiers; this allows consumers who do not watch those lower-demand channels to avoid having to pay for them.  *Id.*

As the complaint explains, a "large segment of consumers of political news and media seeks news, commentary, and analysis that aligns with or speaks to their political viewpoints."  *Id.* ¶ 29.  These consumers treat right-leaning news channels as substitutes, but do not consider left-leaning news outlets or general news channels to be substitutes and seldom switch to such non-right-leaning outlets.  *Id.* ¶¶ 28-30, 69.  Consumers of right-leaning pay TV news also do not treat non-pay-TV sources of right-leaning news, such as print news and conservative websites, as substitutes for right-leaning pay TV news.  *Id.* ¶¶ 30-31, 69.

3

Fox News serves a distinct group of consumers – conservative-leaning viewers who do not substitute other pay TV news for right-leaning news and programming.  *See*, *e.g.*, *id.* ¶ 66 n.32 (OAN president noting that Fox viewers "abandoned Fox and have found a home at" OAN); *id.* ¶ 69.  These consumers make up a large group – Fox News has about double ESPN's viewership – and all distributors carry at least one right-leaning channel, most commonly Fox News, in order to remain competitive.  *Id.* ¶¶ 32-33.

### B.      Fox's Dominance Of The Right-Leaning Pay TV News Market

Rupert Murdoch launched Fox News, with Republican strategist Roger Ailes at its head, in 1996 to offer a right-leaning alternative to CNN.  Compl. ¶ 27.  Since then, Fox has grown into a media company that enjoys durable market power, with more than 90% of the right-leaning pay TV news market, and 65% of the total-day all cable news market.  *Id.* ¶¶ 40, 43, 72.  It claims extraordinary profit margins of approximately 50-55%, significantly outperforming its right-leaning competitors.  *Id.* ¶ 73.  With a market capitalization of $24 billion, it is one of the largest media companies in the world.  *Id.* ¶ 37.

Fox News accounts for 70% of Fox's pre-tax profits.  *Id.* ¶ 38.  Fox News generated approximately $3.3 billion in revenue in 2022, exceeding the combined revenues of its closest rivals CNN and MSNBC.[1]  *Id.* ¶ 73.  Market participants treat Fox News as a "must-have offering," so it is carried on the most widely distributed tiers.  *Id.* ¶¶ 39, 41.  This status gives Fox leverage over distributors, which Fox exercises by imposing onerous restrictions, *id.* ¶¶ 32, 42, 47-48 (threatening blackouts), 52-55 (blocking channels, requiring distributors not to disclose the content of carriage agreements); and charging higher carriage fees than other programmers,

---

[1] MSNBC recently rebranded to MS NOW.  Newsmax will continue to refer to MS NOW as "MSNBC" for consistency with the complaint.

*id.* ¶¶ 42, 71.  Fox News charges nearly double CNN's carriage fees and nearly *six times* those of MSNBC.  *Id.* ¶ 42.  Fox News's supracompetitive carriage fees are such a significant source of its profits that, even if it received no advertising revenue, it would still enjoy a profit margin of more than 35%.  *Id.*

Fox's market power allows it to reduce output.  Fox has restricted, delayed, or kept competitors out of the market for right-leaning pay TV, including newer entrants like Newsmax and OAN.  Compl. ¶ 39.  For nearly a decade, it prevented Hulu+, Sling TV, and possibly other distributors from carrying Newsmax, leaving their viewers without choice in the market other than Fox News.  *Id.* ¶¶ 58, 70.  Fox also prevents right-leaning pay TV carriers from adding Newsmax and other competitors to basic cable packages without being subject to severe financial penalties, reducing consumer choice and raising prices for anyone who wants to watch Newsmax.  *Id.* ¶ 70.  By contrast, the market for non-right-leaning pay TV is characterized by robust competition among firms including CNN, NBC, MSNBC, and others.  *Id.* ¶ 39.

### C.  Fox's Anticompetitive Conduct Harms Competition

Journalist Christopher Ruddy founded Newsmax in 1998 as a right-leaning website, Newsmax.com.  Compl. ¶ 44.  In 2014, Newsmax launched Newsmax TV – the subject of this lawsuit – a right-leaning pay TV channel that sought to compete with Fox News.[2]  *Id.*  Its ratings grew before and after the 2020 presidential election, when right-leaning viewers sought alternatives to Fox News, questioned Fox's reliability, and reacted to Fox's firing of popular right-wing commentator Tucker Carlson.  *Id.* ¶ 45.

---

[2] Newsmax TV is a traditional linear channel that consumers access through standard cable and satellite TV packages.  Newsmax+ is a separate direct-to-consumer online streaming service.

Fox viewed Newsmax as a significant competitive threat, tracked its growth, and developed a plan of attack. *Id.* ¶ 50. Fox wields its market power to drive out and restrict competition, including Newsmax, in the right-leaning pay TV market by coercing distributors to agree to unfair carriage agreements. *Id.* ¶ 51. Newsmax is not Fox's only competitor – AT&T helped launch OAN to compete with Fox in 2013, *id.* ¶ 59, and Fox uses similar tactics against OAN. Fox uses its leverage – its control of the must-have Fox News Channel – to prevent distributors from carrying competitor channels, including Newsmax and OAN. *Id.* ¶¶ 46, 49, 60. Fox also uses this leverage to penalize distributors who carry Fox's competitors, increasing prices for consumers. *Id.* ¶ 46. Executive statements indicate that the leadership of Fox News regards Newsmax as a competitive threat and an alternative to Fox News. *Id.* ¶¶ 50, 65.

Fox sought to combat the threat Newsmax and OAN posed through coercive business arrangements. It conditions carriage agreements on distributors' agreements not to carry competitive news channels, including Newsmax, Compl. ¶ 52, and OAN, *id.* ¶ 60, delaying their growth, *id.* ¶¶ 4, 58, 61. Fox also penalizes distributors that carry Fox's competitors in their basic tiers by requiring those distributors to carry Fox's less popular channels – such as Fox Business and Fox Sports 2 – in their basic tier. *Id.* ¶¶ 3, 54, 58, 61. Fox requires distributors not only to carry these channels that consumers do not want, but to pay Fox a fee for every subscriber that receives those channels. *Id.* ¶¶ 54, 58, 61.

This practice subverts the tier system: instead of basic tiers offering consumers popular channels for less money, Fox wields its market power to clog basic tiers with channels consumers don't want or forcing them only to take Fox News in the basic tier, driving up Fox's license fees and prices – all while penalizing distributors that dare to offer Fox's competitors in their basic tiers. *Id.* ¶¶ 53-56, 46. Put another way, Fox withholds its must-see Fox News

6

content unless distributors agree to exclude Fox's rivals; and Fox punishes any distributors that do not capitulate by making them pay significant licensing fees for Fox's low-demand channels. *Id.* ¶¶ 55-56. Carrying Fox's less popular channels, like Fox Business, costs distributors nearly $5.00 a year per subscriber. *Id.* ¶ 58. Fox also populates its carriage agreements with restrictions and other barriers intended to prevent Newsmax and other competitors from competing. *Id.* ¶ 3.

Fox's restrictive carriage agreements are only one part of its multifaceted campaign to suppress competition. *Id.* ¶¶ 63, 65, 66. Fox has used threats and smears to attack Newsmax, *id.*, hired detectives to investigate Newsmax executives, *id.* ¶ 63, used fake social media accounts to target Ruddy, *id.* ¶ 65, and used "sock puppet" social media attacks on Newsmax and its executives. *Id.* ¶ 66. Fox has also pressured its guests not to appear on Newsmax and avoided booking guests who continued to appear on Newsmax. *Id.* And Fox-owned virtual distributor Tubi refuses to carry competitors, including Newsmax. *Id.* ¶ 67. These actions are in line with Fox's historical abuse of its market power to extract favorable terms for itself without providing procompetitive benefits. *Id.* ¶¶ 47-48. When Newsmax complained of Fox's anticompetitive conduct, Fox responded, "Welcome to the big leagues." *Id.* ¶ 66.

Fox's anticompetitive campaign has harmed competition and consumers. *Id.* ¶¶ 60, 79, 80. Some distributors have complained about Fox's practices; others, such as Fubo, simply dropped Newsmax from new popular packages or delayed carrying Newsmax (DISH Network's vMVPD, Sling TV). *Id.* ¶¶ 57-58. Indeed, Sling TV still does not include Newsmax on either of its two base plans – doing so would cost Sling TV around $20 million a year for carrying Fox's unpopular Fox Business and Fox Sports 2. Instead, Sling TV subscribers who wish to view Newsmax must pay for an additional "News Extra" add-on package. *Id.* ¶ 58. Similarly, for a

decade Hulu+ expressed the desire to carry Newsmax but was prevented from doing so by Fox-dictated restrictive tiering agreements. *Id.*

Fox's tactics similarly hobbled the growth of OAN, a "conservative network" AT&T helped launch to compete with Fox. *Id.* ¶¶ 59-60. It struck agreements with cable distributors not to carry OAN. *Id.* ¶ 60. It required cable operator Mediacom Communications Corporation ("Mediacom") to agree that if it carried a competitor on a widely available tier, it would have to carry Fox News and other Fox channels on the same tier and pay subscriber fees. *Id.* ¶ 61. This delayed Newsmax and other right-leaning channels from being carried by Mediacom. *Id.*

## LEGAL STANDARD

A complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide a defendant with "fair notice" of the claim and "the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). "Detailed factual allegations" are not required, so long as the complaint provides "enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570.

"There is no heightened pleading standard for antitrust claims." *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 639 (N.D. Ill. 2020). An antitrust plaintiff need not "plead law or match facts to elements of legal theories" because "further development" of antitrust claims "requires discovery, economic analysis, and potentially a trial." *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 705 (7th Cir. 2023). An "adequate pleading in a rule of reason antitrust case" requires only "evidence of market structure" and "exclusionary effect." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020) (quoting Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 90 (2018)).

8

"When reviewing a motion to dismiss, the court must accept all well-pleaded, factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Estate of Mouradian v. Jackson Cnty.*, 2024 WL 1675039, at *3 (W.D. Wis. Apr. 18, 2024) (Conley, J.). Even if defendants put forth a plausible counter-narrative, "the court is not 'to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.'" *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 837 (N.D. Ill. 2019) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). In moving to dismiss, a defendant cannot introduce documents outside the four corners of the complaint. *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).

## ARGUMENT

### I.   NEWSMAX ALLEGES A PLAUSIBLE ANTITRUST MARKET

Newsmax pleads facts supporting a plausible antitrust market for right-leaning pay TV news. A relevant product market includes products that are "reasonably interchangeable by consumers for the same purposes."[3] *ABS Glob., Inc. v. Inguran, LLC*, 2016 WL 3963246, at *12 (W.D. Wis. July 21, 2016) (Conley, J.) (citing *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986)). Determining interchangeability involves analyzing "cross-elasticities of demand." *Fishman*, 807 F.2d at 531; *see also FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016). "At the motion to dismiss stage, the burden to allege a relevant market is low." *In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 630 (N.D. Ill. 2025). Dismissal on the pleadings is generally limited to rare circumstances – not present here – where the alleged market is limited to a single brand or completely unexplained. *See Todd v. Exxon Corp.*, 275

---

[3] Fox does not dispute Newsmax's proposed geographic market, the United States, *see* Compl. ¶¶ 75-78.

9

F.3d 191, 200 (2d Cir. 2001); *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070-71 (N.D. Ill. 2016).

Courts seldom dismiss antitrust complaints for failing to plead a proper market, because determining an antitrust market's scope requires "a factual inquiry into the commercial realities faced by consumers." *ABS Glob.*, 2016 WL 3963246, at *12 (cleaned up); *see also Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 586 (7th Cir. 2022) (pleading stage "not the time to evaluate the merits of" a market because it would require "expert testimony"). Courts do not "engage in extensive analyses of reasonable interchangeability and cross elasticity of demand" on a motion to dismiss. *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 765 (N.D. Cal. 2022).

Newsmax more than carries its burden to allege a plausible market for right-leaning pay TV news. *MultiPlan Health*, 789 F. Supp. 3d at 630. It alleges quantitative facts about consumer substitution, *Fishman*, 807 F.2d at 531, and facts satisfying the *Brown Shoe* factors. Fox challenges the market as too narrow, arguing it must include *all* news (not just right-leaning news) and *all* media for delivering that news (not just pay TV). But Newsmax need not plead the broadest possible market. *See ABS Glob.*, 2016 WL 3963246, at *12-15 (denying motion for summary judgment on product market where defendant argued plaintiff's proposed market was too narrow). The complaint explains a straightforward, intuitive, commercial reality: a right-leaning pay TV viewer would not respond to a Fox price increase by switching to MSNBC, scouring the internet, or listening to niche, "new-media" podcasts.

### A.      Right-Leaning Pay TV News Is A Cognizable Antitrust Market

The complaint alleges facts showing that right-leaning pay TV news is not "reasonably interchangeable" with other news media. Broad product markets may contain submarkets that themselves "constitute product markets for antitrust purposes." *ABS Glob.*, 2016 WL 3963246, at *12; *see also Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701, 709-10 (7th Cir. 1977).

10

### 1.      Right-leaning TV news is not interchangeable with other TV news

Newsmax alleges that many consumers seek "news, commentary, and analysis that aligns with or speaks to their political viewpoints."  Compl. ¶¶ 29, 69.  Right-leaning viewers demonstrate minimal switching to non-right-leaning news outlets like CNN or MSNBC.  *Id.* ¶¶ 30 & n.3, 60.  Fox News "has the largest singularly dedicated audience," with 24% of American adults watching *only* Fox News.[4]  Competitors in the right-leaning pay TV market include Fox News, Newsmax, and OAN.  *Id.* ¶ 68.

Even viewers who watch channels offering other political perspectives "do not view those other news channels as substitutes for right-leaning news channels."  *Id.* ¶¶ 29, 69.  This preference is so strong that "any cable or satellite package that omits a meaningful right-leaning news option risks losing that portion of its customer base."  *Id.* ¶¶ 32-33.  Accordingly, "cable and virtual MVPDs all carry at least one right-leaning channel – most commonly Fox News – in order to remain competitive and avoid subscriber churn."  *Id.* ¶ 32.

By virtue of consumer preference for right-leaning TV news and Fox's monopoly power in this market, "distributors consider Fox News a 'must-carry' channel for their basic package to satisfy subscriber demand."  *Id.* ¶ 41.  When right-leaning viewers began to question Fox News's reliability after the 2020 election, they turned to Newsmax – not CNN or MSNBC – for "fresh and different right-leaning news."  *Id.* ¶ 45.  Recognizing this substitution, Fox executives were "not concerned with losing market share to CNN or MSNBC right now," but to "Newsmax and One America News Network."  *Id.* ¶ 50.

---

[4] Mark Jurkowitz & Amy Mitchell, *How Americans Get TV News at Home*, Pew Rsch. Center (Oct. 11, 2013), https://www.pewresearch.org/journalism/2013/10/11/how-americans-get-tv-news-at-home/ [https://perma.cc/W4HL-UN9E] [hereinafter *TV News at Home* PEW Study] (cited in Compl. ¶ 31 n.4).

Though Newsmax is not required to allege specific empirical data to support its market definition, empirical data on cable-news viewing behavior supports the plausibility of Newsmax's allegations.  More than 50 million Americans consume more than eight hours of "partisan television" each month,[5] with "nearly no crossover viewership between left- and right-leaning partisan channels."[6]  "Only 5% of registered Republicans who watch at least 8 hours/month of Fox News also watch at least 4 hours/month of CNN or MSNBC,"[7] and left-leaning audiences tend not to watch Fox News.[8]  Different types of political news, like different types of sports broadcasts, can constitute separate submarkets.  *See, e.g.*, *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1155 (9th Cir. 2019) (market of live video of NFL regular-

---

[5] Guzman Decl. Ex. 1 (David E. Broockman & Joshua L. Kalla, *Selective exposure and echo chambers in partisan television consumption: Evidence from linked viewership, administrative, and survey data*, 69 Am. J. Pol. Sci. 847, 847 (2025)) [hereinafter Broockman & Kalla, *Partisan Television Consumption*].

In opposing a motion to dismiss, a plaintiff may "elaborate on [its] factual allegations so long as the new elaborations are consistent with the pleadings" without converting the motion to dismiss into a motion for summary judgment.  *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (collecting cases); *see also Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992); *Columbia River Techs. 1, LLC v. Blackhawk Grp. LLC*, 2019 WL 4850168, at *2 n.2 (W.D. Wis. Oct. 1, 2019); *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 528 n.8 (7th Cir. 2015); *Taizhou Yuanda Inv. Grp. Co. v. Z Outdoor Living, LLC*, 2020 WL 2849966, at *4 (W.D. Wis. June 2, 2020).

[6] Broockman & Kalla, *Partisan Television Consumption*, at 857; *see also id.* ("[C]rossover viewership between partisan [cable] and broadcast channels is far from the norm.").

[7] *Id.* at 858.

[8] *Id.* at 857; *see also* Guzman Decl. Ex. 2 (Daniel Muise et al., *Quantifying partisan news diets in Web and TV Audiences*, Sci. Advances at 6 (2022)) ("Most Americans who consume mostly MSNBC rarely consume news from any other source besides CNN, while most Americans who consume mostly Fox News do so at the expense of all other sources." (cleaned up)) [hereinafter Muise et al., *Quantifying partisan news diets*].

12

season games with submarket for out-of-market game broadcasts).  Since its inception, Fox

News programming has shifted further to the right.[9]

### 2. The complaint adequately alleges pay TV news is not reasonably interchangeable with other media

Newsmax alleges that right-leaning pay TV news is not interchangeable with other forms

of conservative news content.  Compl. ¶ 31.  Very few Americans substitute right-leaning pay

TV (including streaming TV) with other right-leaning media, such as social media or podcasts.

*Id.*  Pay TV news offers a curated programming lineup that helps consumers decide what news to

follow with their limited time.  *Id.* ¶ 22.  "Empirical data indicates that right-leaning pay TV

News viewers remain firmly attached to . . . video media."  *Id.* ¶ 30.

The majority of Americans, especially older adults, prefer to consume news via

television.[10]  These media-based preferences are reflected in consumer trust:  "both Democrats

and Republicans generally are more likely to trust certain television networks over print or online

outlets."[11]  Accordingly, researchers study cable news separately from social media news,

podcasts news, local TV, network news, newspapers, and public broadcasting.[12]  Because of the

---

[9] Guzman Decl. Ex. 3 (Gregory J. Martin & Ali Yurukoglu, *Bias in Cable News: Persuasion and Polarization*, 107 Am. Econ. Rev. 2565, 2595-96 (2017)).

[10] Taylor Orth & Carl Bialik, *Trust in Media 2024: Which news sources Americans trust – and which they think lean left or right*, YouGov (May 30, 2024), https://today.yougov.com/politics/articles/49552-trust-in-media-2024-which-news-outlets-americans-trust [https://perma.cc/S6EZ-2XRL] (cited at Compl. ¶ 30 n.3) [hereinafter Orth & Bialik, *Truth in Media 2024*]; Emily Tomasik & Christopher St. Aubin, *More Americans prefer to watch the news than read or listen to it*, Pew Rsch. Center (Nov. 20, 2025), https://www.pewresearch.org/short-reads/2025/11/20/more-americans-prefer-to-watch-the-news-than-read-or-listen-to-it/ [https://perma.cc/N8VC-5A2K] [hereinafter Tomasik & Aubin Pew article].

[11] Orth & Bialik, *Truth in Media 2024*.

[12] *Cable News Fact Sheet*, Pew Rsch. Center (Sep. 14, 2023), https://www.pewresearch.org/journalism /fact-sheet/cable-news/ (cited at Compl. ¶ 73 n.38) [https://perma.cc/GF5S-HBSK].

dearth of competition for right-leaning pay TV news AT&T helped launch OAN as a pay TV channel in 2013, not as a website or a podcast. *Id.* ¶ 59 & n.26. Courts have approved product markets premised upon television's distinctiveness. *See*, *e.g.*, *In re Local TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *12 (N.D. Ill. Nov. 6, 2020) (plausible product market for "sale of broadcast television spot advertising on broadcast television stations"); *NFL's Sunday Ticket*, 933 F.3d at 1155 (markets for "live video presentations" and "game broadcasts" of NFL games, even when fans could attend games in-person or listen to radio broadcasts).

Notwithstanding the rise of internet news and apps, a core group of consumers remain loyal to right-leaning pay TV news. Of those who watch news, a majority prefer television.[13] "Millions" of Americans remain "loyal consumers of cable TV news stations."[14] Television news still accounts for "roughly five times as much news consumption for average Americans than all online sources combined."[15] And vMVPDs continue to gain subscribers. Compl. ¶ 24.

Format differences explain why viewers who seek televised news do not treat written, social, or audio content as substitutes. *See*, *e.g.*, *Cass Student Advert., Inc. v. Nat'l Educ. Advert. Serv., Inc.*, 516 F.2d 1092, 1099 (7th Cir. 1975) (newspapers "constitute a distinct communications medium"); *Local TV Advert.*, 2020 WL 6557665, at *12 (finding plausible allegations that "broadcast television spot advertising is not reasonably interchangeable with other forms of advertising," including "digital media" advertisements); *cf. Fort Wayne Telsat v.*

---

[13] Tomasik & Aubin Pew article. Television remains the preferred media format for 23% of those who prefer listening to the news as well. *Id.*

[14] Guzman Decl. Ex. 4 (Homa Hosseinmardi et al., *Unpacking media bias in the growing divide between cable and network news*, Sci. Reps. at 1 (May 21, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12095647/ [https://perma.cc/PU8S-AG35]) [hereinafter Hosseinmardi et al., *Unpacking media bias*].

[15] *Id.* at 2.

*ESPN*, 753 F. Supp. 109, 112 (S.D.N.Y. 1990) (declining to dismiss complaint that stated a "market for subscription television programming services for quality sports programming"). Television, unlike podcasts or print media, is both visual and auditory, and pay TV news provides a curated presentation of tailored news stories.  Compl. ¶ 22.  It conveys information through live footage, graphics, pacing, and on-screen cues in a way that text and audio alone cannot replicate.  Even among video formats, pay TV channels, with their larger budgets, provide higher-quality programming than free video news on social media.  Pay TV news depends upon "personalities" who affect ratings and a network's ability to attract and retain an audience and sell advertising.  Compl. ¶ 29.  And pay TV news is "appointment-based" – viewers must tune in at a specific time, often as a habitual part of their daily routine.

### 3. The complaint adequately alleges the *Brown Shoe* practical indicia

"[P]ractical indicia," including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors," support the market for right-leaning pay TV news.  *Cass Student Advert.*, 516 F.2d at 1094, 1099-100 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

*Industry and public recognition.*  Industry players and the viewing public recognize right-leaning pay TV news as a separate economic entity.  *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 714 (7th Cir. 1979) (analyzing industry and consumer perception).  Newsmax has always treated Fox as a competitor in a distinct submarket for right-leaning pay TV News consumers.  *See* Compl. ¶ 44 (Newsmax introduced "a new voice in cable news specifically aimed at right-leaning audiences and in an attempt to compete with Fox News").  And Fox, too, regards Newsmax as a unique competitive threat.  *Id.* ¶ 50.  Rupert Murdoch and Roger Ailes not only formed Fox with the intention of targeting right-leaning pay TV consumers, *id.* ¶¶ 27, 44,

15

but Murdoch recently paid billions of dollars to ensure that Fox News will remain conservative in Lachlan Murdoch's hands.  Many other news outlets, including CNN,[16] have recognized the distinct nature of the "conservative cable-news market."[17]

The broader public also recognizes right-leaning pay TV news as a separate economic entity.  Compl. ¶¶ 29-30.  This includes elected officials on both sides of the aisle, often the focus of reporting in the market.  President Trump has noted, "[m]any great alternatives [to Fox] are forming & exist.  Try @OANN & @newsmax, among others!"[18]  Meanwhile, Democratic House Representatives have threatened cable, satellite, and streaming providers because they carried "the right-wing media ecosystem," specifically "Newsmax, [OAN], and Fox News."[19]  Fox News has historically stood alone in providing cable TV news to right-leaning audiences.[20]

***Peculiar characteristics and uses.***  Right-leaning pay TV News channels consist of "political and cultural talent tailored to right-leaning viewers" and "well-known media personalities," such as Sean Hannity.  Compl. ¶¶ 22, 29.  Programmers like Fox target right-of-

---

[16] *See*, *e.g.*, Brian Stelter, *Trump voters are flocking to a TV channel that claims Biden is not president-elect*, CNN (Nov. 12, 2020), https://edition.cnn.com/2020/11/12/media/fox-news-newsmax-reliable-sources/index.html [https://perma.cc/S3M5-LFNY] ("While Newsmax is still relatively small, this is the most robust right-wing TV challenge to Fox that I have ever seen.").

[17] Guzman Decl. Ex. 5 (Philip Bump, *The marketplace for fantasy is reshaping conservative media, just like it reshaped conservative politics*, Wash. Post (Dec. 9, 2020), https://www.washingtonpost.com/politics/2020/12/09/marketplace-fantasy-is-reshaping-conservative-media-just-like-it-reshaped-conservative-politics/).

[18] Donald J. Trump (@realdonaldtrump), X (Nov. 15, 2020, at 07:25 AM ET), https://x.com/realDonaldTrump/status/1327950785959915520 [https://perma.cc/MQ2M-VPXB].

[19] *See* Letters from U.S. House Representatives Anna G. Eshoo & Jerry McNerney to CEOs of cable, satellite, and streaming providers (Feb. 22, 2021), https://docs.house.gov/meetings/IF/IF16/20210224/111229/HHRG-117-IF16-20210224-SD002.pdf [https://perma.cc/WUL8-N2RV].

[20] *See*, *e.g.*, Broockman & Kalla, *Partisan Television Consumption* at 852 (distinguishing between "three kinds of television news: Fox News, liberal partisan television, and national broadcast news"); Muise et al., *Quantifying partisan news diets* at 9 (coding Fox News as "partisan right," MSNBC as "partisan left," and CNN "alternatively as partisan left or centrist").

16

center viewers, *id.* ¶ 27, with right-leaning political and cultural commentary on topics salient to those viewers, including immigration, culture war disputes, and critiques of Democratic governance.  *Id.* ¶¶ 28-30, 44-45; *see Columbia Broad. Sys., Inc. v. FTC*, 414 F.2d 974, 979 (7th Cir. 1969) (record club market had sufficient peculiar characteristics to constitute a submarket of the overall record market).  It is well understood that Fox News, left-leaning cable channels like MSNBC, and nonpartisan TV (e.g., broadcast networks) offer different types of programming.[21]

*Distinct customers.*  Right-leaning pay TV news has a distinct, nontrivial customer base.  *See supra* pp. 11-12.  "Distributors that fail to carry right-leaning news coverage . . . risk losing substantial advertising revenue," Compl. ¶ 33, and as "the only significant outlet for right-leaning TV news," MVPDs "treat [Fox News] as a must-have offering," *id.* ¶ 39.

*Distinct prices.*  Right-leaning pay TV news is priced differently from other media.  Consumers pay higher prices for bundled pay TV packages than for direct-to-consumer ("DTC") offerings.[22]  *Id.* ¶¶ 23-24.  Meanwhile, much online news outside of vMVPDs, including many podcasts, is free.  *See Photovest*, 606 F.2d at 713 (price differentials between drive-thru photo processing and conventional-retail photo processing supported submarket).

*Specialized vendors.*  A core input for right-leaning pay TV news is "on-air talent," Compl. ¶ 22, and "well-known media personalities whose style and viewpoints uniquely resonate

---

[21] *See*, *e.g.*, Hosseinmardi et al., *Unpacking media bias* at 4 (Fox News pays "disproportionate attention to the economy, taxes, immigration, and terrorism," MSNBC focuses on "abortion and ethnicity," and broadcast networks cover "issues with less overt partisan coding: education, technology, and drugs"); *id.* at 9 (the topics Fox covers and the language it uses have "diverged increasingly from CNN and MSNBC, which have simultaneously converged").

[22] *Compare*, *e.g.*, https://www.newsmaxplus.com [https://perma.cc/4TC4-9CDS] (Newsmax+, a DTC internet offering, offered at $4.99 per month), *with*, *e.g.*, https://tv.youtube.com/welcome/ [https://perma.cc/LNV3-89BN] (YouTube TV, a vMVPD, offered at $82.99 per month).

with a right-leaning audience," *id.* ¶ 29; *see also id.* ¶ 66 (detailing Fox's attempt to monopolize input by pressuring guests to stop appearing on Newsmax).  The supply side for right-leaning pay TV news relies upon a relatively specialized set of vendors – networks and talent capable of producing a format and viewpoint-aligned product that right-leaning audiences will watch and trust.  *See Cass Student Advert.*, 516 F.2d at 1099 ("national advertising representatives specialize by medium"); *Photovest*, 606 F.2d at 714 ("kiosks are a specialized method of retailing distinct from other conventional methods").

### B.  Fox Does Not Demonstrate That The Market Is Implausible

Fox largely ignores the allegations in the complaint.  Citing its preferred counter-narrative, Fox argues (at 11-19) that the implausibility of a market for right-leaning pay TV news requires dismissal.  But Fox raises factual disputes, and Fox's principal authorities, *In re Harley-Davidson Aftermarket Parts Marketing, Sales Practices & Antitrust Litigation*, 151 F.4th 922 (7th Cir. 2025), and *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018), are outliers involving deficient complaints that turned on single-brand theories, facially unsustainable market definitions, or focused on contractual disputes.  Fox also mistakenly argues that Newsmax must plead the broadest possible market, one that includes all TV news and all formats.  *See Sargent-Welch*, 567 F.2d at 709-11 & n.17 (an " 'area of effective competition' may be a small submarket supplying specialized products or services," and holding that rejection of an electronic microbalance submarket was clearly erroneous).

18

### 1. Fox improperly asks the Court to accept its facts, which do not show that Newsmax's market is implausible

Fox cannot defeat the complaint with its preferred factual counter-narrative (at 1, 4, 14) that Newsmax and Fox compete in a broad sense with CNN and MSNBC, or with right-leaning content outside of pay TV.  The complaint alleges that Fox, Newsmax, and OAN target a large and lucrative core group of consumers who seek out right-leaning pay TV news consistently. Compl. ¶¶ 28-32, 69.  Resolution of factual dispute requires discovery and a trial.  *See*, *e.g.*, *Deslandes*, 81 F.4th at 705.  Fox simply ignores the facts in the complaint, which offer far more than "bare assertions" and a "rote recitation of the elements."  *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 21 (D.D.C. 2025); *Hicks*, 897 F.3d at 1122.

In any event, antitrust law allows a submarket consisting of the core customers – even if discovery eventually shows that Fox, Newsmax, and OAN sometimes compete "for marginal consumers in the broader market."  *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008); *see also ABS Glob.*, 2016 WL 3963246, at *12; Compl. ¶¶ 20-23, 27-33, 39-40, 43-45.  When firms "differentiate themselves by offering a particular package of goods or services," there may be "a central group of customers for whom 'only [that package] will do.'"  *Whole Foods*, 548 F.3d at 1038-40 (finding a submarket for "premium, natural, and organic supermarkets" even though those retailers also competed with conventional supermarkets (e.g., Safeway) for some shoppers, and reversing a district court's denial of a preliminary injunction). Fox also asks this Court to take "judicial notice" of stray statements in SEC filings and Newsmax's website, none of which were intended to describe an antitrust market.  *See* Mot. at 4 & n.1, 12 & n.5, 14 & nn.9-10, 18, 21, 30 n.17.  Fox's citations to these statements are inappropriate at this stage.  *See Levenstein*, 164 F.3d at 347.  "[I]ndisputability is a prerequisite" to judicial notice of the truth of facts asserted in a document, as opposed to the mere existence of

that document.  *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) (affirming decision not to take judicial notice of a 10-K filing whose contents were subject to dispute); *see My Health, Inc. v. General Elec. Co.*, 2015 WL 9474293, at *1, 4 (W.D. Wis. Dec. 28, 2015) (declining to consider websites introduced by defendant).  Fox's cases (at 14 n.9) do not suggest otherwise.  *Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 178-79 & n.8 (S.D.N.Y. 2006) (citing Fed. R. Evid. 201(b)), considered a website for information regarding the existence of a sale.  *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020), took judicial notice to determine what a website stated, not the truth of its contents.

Moreover, Fox's handpicked statements are misleading.  For example, Fox's citation (at 14 & n.10) to Newsmax's investor presentation mischaracterizes the document.  Newsmax contrasted its competition with CNN and MSNBC for "top advertisers"[23] with competition in the "news business," which is "less competitive on the right,"[24] and where the "battleground" was "settled" with "competitors" in a broad sense like CNN or MSNBC, but not with a single entity: Fox News.[25]  Newsmax drew a distinction between core and marginal competitors, it did not purport to describe an antitrust market.  SEC filings routinely disclose all possible risks broadly, for reasons having nothing to do with antitrust law.  *See Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1318-19 (D. Md. 1986) (company's reference to a "market" is not necessarily a reference to an antitrust market), *aff'd*, 831 F.2d 537 (4th Cir.

---

[23] Investor Presentation, Newsmax, at 10 (Nov. 2025), https://ir.newsmax.com/overview/default.aspx [https://perma.cc/9YRN-4R3B] [hereinafter Newsmax Investor Presentation].

[24] Newsmax Investor Presentation at 6.

[25] Newsmax Investor Presentation at 7.

1987).

Fox also suggests (at 4 & n.1, 12 & n.5) the Court can consider Newsmax's Offering Circular and a PEW Survey because the complaint "referenced" those documents. Incorporation by reference applies only to documents "central to [plaintiff's] claims." *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 803 (N.D. Ill. 2022); *accord Wertymer v. Walmart, Inc.*, 142 F.4th 491, 498-99 (7th Cir. 2025) (case cited by Fox (at 12 n.5) calling "authoritative" "one of the key documents" to plaintiff's claim). Fox makes no effort to show that either of these documents is "central" or "key" to the complaint. They are not.

Considering these documents would not assist Fox in any event. For example, the PEW Survey Newsmax cites, Compl. ¶ 31, confirms: "Despite some crossover, there are also viewers who watch only one of the three cable channels. Here, Fox News Channel narrowly has the largest singularly dedicated audience. About one-quarter of American adults, (24%) watch only Fox News . . . ."[26] Recent research indicates that the number of exclusive Fox viewers has only increased with time. *See supra* note 8.

Fox contends (at 16-19) that Americans have moved to other sources for media content, but "[t]he law does not require an exclusive class of customers for each relevant submarket." *Photovest*, 606 F.2d at 714. In any case, other types of news are not reasonably interchangeable with pay TV news. *See* Compl. ¶¶ 30-31, 59 & n.36; *supra* pp.13-15; *see also Local TV Advert.*, 2020 WL 6557665, at *12 (finding plausible allegations that "broadcast television spot advertising is not reasonably interchangeable with other forms of advertising," including "digital media" advertisements); *NFL's Sunday Ticket*, 933 F.3d at 1155 (markets for "live video presentations" and "game broadcasts" of NFL games, even when fans could attend games in-

---

[26] *TV News at Home* PEW Study.

person or listen to radio broadcasts); *Cass Student Advert.*, 516 F.2d at 1099 (newspapers "constitute a distinct communications medium"). "[T]he partisan TV news audience is growing in absolute terms even as the entire TV news audience is shrinking."[27]

Fox's assertion (at 19) that Newsmax excludes vMVPDs mischaracterizes the complaint. Compl. ¶ 68 (market includes "internet-based distributors"). And even though consumers "can get video news from broadcast television," Mot. at 17, that news is not provided from a right-leaning perspective. Similarly, Fox's (improper) reliance (at 17) on a single DTC offering does not establish that DTC distribution is a feasible means to reach end consumers. Separate distribution methods may reflect multiple submarkets for "nearly identical" end products when consumers receive a different "total service." *Photovest*, 606 F.2d at 714 (separate submarkets for photo processing at drive-thru kiosks and via "conventional retailing methods"); *Pepsico, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *7-12 (S.D.N.Y. Aug. 27, 1998) (separate submarket for fountain-dispensed soft drinks "distributed through foodservice distributors").

In any event, Fox's factual disputes regarding the state of the market in 2025 ignore Newsmax's "quintessentially backward looking" claims for damages. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 282 (1994); *cf. United States v. U.S. Steel Corp.*, 251 U.S. 417, 444 (1920) (considering the contemporaneous market in a suit for prospective relief). For purposes of Newsmax's damages claims, the Court should look to "the market at the time the conduct occurred." *See Nukote of Ill., Inc. v. Clover Holdings, Inc.*, 2015 WL 13729264, at *3 (N.D. Tex. Sep. 10, 2015) (quoting *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000)).

### 2. Fox relies on outlier, inapplicable cases

Courts rarely delve into the market definition allegations at the motion to dismiss stage

---

[27] Muise et al., *Quantifying partisan news diets*, at 8.

because those issues are inherently factual. *See Delta Dental*, 484 F. Supp. 3d at 641 ("Courts are generally hesitant to dismiss a Sherman Act claim for failure to allege a relevant product because market definition is a deeply fact-intensive inquiry." (cleaned up)); *ABS Glob.*, 2016 WL 3963246, at *12; *Vasquez*, 40 F.4th at 586. Fox argues this complaint fits into the exception to the general rule, but the cases Fox relies on show otherwise. All of them identified a facial defect in the complaint, and many were decided only after development of a factual record.

Newsmax does not allege a single-brand market, so most of the authority Fox cites as support for its argument that right-leaning pay TV is too narrow simply does not apply. For example, Fox relies (at 11-15) on *Harley-Davidson*, in which the Seventh Circuit rejected a submarket for American-made motorcycles. The court found the allegations "more consistent with a single-brand submarket." 151 F.4th at 934; *see also New Orleans Ass'n of Cemetery Tour Guides v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1038-39 (5th Cir. 2023) (rejecting market that consisted "only of cemetery tours of two cemeteries"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437-41 (3d Cir. 1997) (market for Domino's goods and services).

Newsmax's case is distinguishable from Fox's cases, in which plaintiffs misunderstood their own product markets, failed to account for reasonable substitutes, and contradicted their alleged markets. *See*, *e.g.*, *Colonial Med. Grp. v. Cath. Health Care W.*, 444 F. App'x 937, 938 (9th Cir. 2011) (complaint did not explain "why medical service for state and federal prisoners are not interchangeable with services for other incarcerated individuals"); *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597-98 (8th Cir. 2009) (rejecting product market limited to a single payment method when plaintiff alleged that it could sell both to privately insured individuals and those on government insurance); *Shire US, Inc. v. Allergan, Inc.*, 375 F.

23

Supp. 3d 538, 551 (D.N.J. 2019) (similar rejection of a product market restricted to Medicare-recipient purchasers); *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F. Supp. 2d 465, 472-73 (E.D.N.Y. 2005) (plaintiffs contradicted their product market allegations and failed to explain why customers would not substitute other types of lumber).

*Hicks* is likewise inapposite. There, the court rejected a "facially unsustainable" single-product market premised upon a particular advertising format to which golf caddies had previously consented, 897 F.3d at 1123, because that definition required the "implausible assumption" that other forms of advertising would not influence golf fans, *id.* at 1120-22. Here, by contrast, "judicial experience and common sense" cut the other way. *Id.* at 1121. Inferring that cable news consumers are indifferent between pay TV, podcasts, streaming services, and social media is both contrary to the complaint and implausible. *See supra* pp. 13-18. No "undisputed evidence" suggests otherwise. *See Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-63 (9th Cir. 1997) (reversing post-trial denial of motion for judgment as a matter of law when "plaintiffs' own expert testified that . . . direct purchases fall within the relevant market").

### 3.     Newsmax's market is well defined

Fox also argues (at 15) that Newsmax's market is so "amorphous" and "subjective" that it must be rejected at the motion to dismiss stage. This argument is a quibble about the boundaries of the relevant market – it does not "suggest that there is *no* plausible relevant market." *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 889 (N.D. Ill. 2022) (rejecting subjectiveness challenge to "Market for Elite, Private Universities"); *see also Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1165 (D. Nev. 2016) ("live Elite Professional MMA" bouts and fighter services); *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 24, 33 (D.D.C. 2022) ("anticipated top-selling books").

The cases Fox cites for its vagueness argument are inapposite.  For example, in *Carter Hawley Hale Stores, Inc. v. Limited, Inc.*, 587 F. Supp. 246, 253 (C.D. Cal. 1984), the court found terms such as "moderate-priced" were not "subject[] to economic analysis" and plaintiffs' witnesses provided conflicting testimony about their meaning.  By contrast, Newsmax has not had the benefit of discovery to develop an evidentiary record, which will substantiate its allegations.  *See also Huhta v. Children's Hosp. of Phila.*, 1994 WL 245454, at *3 (E.D. Pa. May 31, 1994) (rejecting market at summary judgment after plaintiffs' expert made no "attempt to define a 'seriously ill patient'"); *Hendershot v. S. Glazer's Wine & Spirits of Okla., LLLP*, 2021 WL 3501523, at *11 (N.D. Okla. Aug. 9, 2021) (plaintiff failed to define "top 25 brands," by metrics (e.g., volume, revenue) or geography, or explain cutting market at 25 brands).

Fox's invocation of the First Amendment (at 16) also fails.  Newsmax identifies a standard commercial market in which it suffered financial harm.  Fox has no First Amendment right to insist on exclusivity in its carriage agreements.  There is no First Amendment right to lean on guests to appear only on Fox shows.  As evidenced by the allegations about Fox's unrivaled financial success, the market in this complaint is plainly a commercial one.  Newsmax is unlike the plaintiffs in *Johnson v. Commission on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2017), who did not "define a commercial market" when they identified the "presidential campaign market," "electoral politics market," and "presidential candidates market," *id.* at 983.  Similarly, in *DataCell ehf. v. Visa, Inc.*, 2015 WL 4624714 (E.D. Va. July 30, 2015), plaintiffs alleged harm to an undefined "media market" based upon the suppression of "the market place of ideas," *id.* at *6.

Contrary to Fox's argument, preventing Fox from crushing competition actually serves First Amendment goals by promoting "the widest possible dissemination of information from

25

diverse and antagonistic sources." *Associated Press v. United States*, 326 U.S. 1, 20 (1945) (applying the Sherman Act to media organizations does not abridge freedom of the press); *see also Lorain J. Co. v. United States*, 342 U.S. 143, 155-56 (1951) (injunction against a publisher does not violate the First Amendment).

## II.   NEWSMAX PLAUSIBLY ALLEGES A SECTION 1 VIOLATION

The complaint pleads all the elements of a Section 1 claim under the Sherman Act:  "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012) (cleaned up); *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018).  Simply put, Newsmax alleges that Fox insists on certain features in its carriage agreements with distributors for the very purpose of disadvantaging, stunting, and even excluding Newsmax and OAN.  These are cognizable antitrust injuries to both competitors and to consumers.  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1802c (5th ed. 2025) ("Areeda & Hovenkamp") (improperly delaying rivals' growth is actionable).

### A.   Fox's Carriage Agreements Restrict Competition

Newsmax alleges that Fox entered into written agreements with distributors that restricted their ability to carry Newsmax's channels.  Compl. ¶¶ 3, 60, 82.  Fox penalizes distributors who include its competitors in their basic tier offerings by requiring them to carry Fox's less-popular channels and pay Fox carriage fees.  *Id.* ¶¶ 53-58.  And Fox uses other restrictive contract provisions that it has kept hidden by prohibiting disclosure of its carriage agreements.  *Id.* ¶¶ 3, 46, 53, 82.

To show unreasonable restraint, a plaintiff must allege "(1) evidence of market structure (i.e., market power and relevant markets . . . ) and (2) exclusionary effect (i.e., foreclosure of a

26

competitor from a market . . . ).” *Viamedia*, 951 F.3d at 462 (cleaned up).  “[I]f a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant’s market power – in lieu of the usual showing of a precisely defined relevant market and a monopoly market share.”  *Republic Tobacco Co. v. North Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (footnote omitted).  Showing the exact percentage of market foreclosure is not required; “the only question at this stage is whether the allegations raise a reasonable inference that Defendants’ exclusive-dealing provisions could foreclose a substantial portion of the market and reduce output.”  *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 655 (N.D. Ill. 2022) (cleaned up).  Newsmax alleges a defined relevant market and both direct evidence of Fox’s monopoly power and evidence of Fox’s market share.

The complaint alleges market power – indeed, it pleads that Fox is a monopolist.  More than ten pages of allegations detail the structure of the market for right-leaning pay TV and Fox’s dominance in that market.  *See* Compl. ¶¶ 20-36 (creation and distribution of right-leaning pay TV content), 37-43 (Fox’s dominance), 53-62 (Fox’s strategies to maintain control in the market).  Newsmax alleges that, as of 2023, Fox averaged 90% of the right-leaning pay TV market.  *See id.* ¶ 40; *MCI Commc’ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) (courts infer monopoly power when market share is over 70%).  When a monopolist imposes exclusive agreements on distributors, courts do not presume those arrangements are procompetitive.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 285 (3d Cir. 2012) (collecting cases for the proposition that “a monopolist may use its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice”).

27

As for market foreclosure, the complaint is replete with examples of Fox using restrictive agreements to foreclose or delay entry of at least two competitors from the market: Newsmax and OAN. *See Surescripts*, 608 F. Supp. 3d at 655 (foreclosure of one competitor sufficient). Fox "coerce[s] distributors into unfair terms that either prevent those distributors from carrying competitors of Fox News, including Newsmax, or impose financial penalties on them for doing so." Compl. ¶ 46. Fox's carriage agreements enable it "to foreclose or delay meaningful competition," *id.* ¶ 86, including its agreements with Sling TV to preclude Newsmax and similarly situated competitors, *id.* ¶ 120. Fox hobbled OAN's growth and prevented its carriage on major cable systems. *Id.* ¶ 60; *see also id.* ¶¶ 81 ("Fox enforces or extends its exclusionary terms or abuses its monopoly power to foreclose competition in the Right-leaning Pay TV News Market."), 94 (Fox "prevent[s] right-leaning pay TV carriers from adding Newsmax and similarly situated competitors to their basic cable package.").

## B.   Fox's Conduct Causes Antitrust Injury

Fox's anticompetitive strategies "increase price" and "reduce output," *NCAA v. Alston*, 594 U.S. 69, 88 (2021), generating "higher prices and reduced consumer choice," *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789 (6th Cir. 2002) (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 234 (1993)); *see* Compl. ¶¶ 51, 62, 70, 80, 90.

By using exclusive carriage provisions to prevent competitors from gaining a foothold in the market, Fox artificially solidified itself as the sole, "must have" right-leaning pay TV channel. Compl. ¶ 46. This "must have" status enables Fox to demand "significantly higher carriage fees than any other cable news channel" – two-to-six times higher. *Id.* ¶ 42 (comparing Fox's price of "roughly $2.18 per subscriber per month" to that of other channels). When Fox "charge[s] pay TV carriers supracompetitive prices," the distributors pass those costs "on to all

28

pay TV consumers." *Id.* ¶ 71.  Fox's conduct thereby causes anticompetitive injury by "increas[ing] price[s]" paid by consumers.  *Alston*, 594 U.S. at 88; *see* Compl. ¶¶ 19 ("As a result of Fox's conduct, consumers in the Western District face supracompetitive prices."), 51 (same), 80 (same).

Fox also raises prices by requiring distributors who carry its competitors in their basic tier to carry Fox's less popular channels and pay Fox exorbitant carriage fees for the privilege of doing so.  Compl. ¶¶ 42, 53-55, 58 (Fox's less popular channels cost distributors $4.92 a year per subscriber compared to $2.18 for Fox News).  These fees are also passed on to consumers in the form of higher prices.  *Id.* ¶¶ 53, 71.

Fox's anticompetitive provisions reduce consumer choice and output.  Without them, consumers of right-leaning pay TV would be free to choose between Fox, Newsmax, OAN, and potential new entrants.  *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (finding that "withhold[ing] from . . . customers a particular [product] that they desire" "limit[s] consumer choice by impeding the 'ordinary give and take of the marketplace'").  Instead, consumers who rely on Sling TV have been left "without any choice . . . other than Fox," because Fox "successfully prevented Sling TV from adding Newsmax (and potentially other similarly situated competitors)."  Compl. ¶ 70.  Consumers using Fubo, Hulu+, and Mediacom have faced similar limited choice.  *Id.* ¶ 85; *see also id.* ¶¶ 57, 61.

If an aspiring conservative news channel is unable to secure timely or economically feasible carriage (and thus payment) for its content, it is not financially viable to keep producing content, much less increase production.  Conversely, growing channels with a foothold in the market can be expected to increase content production to meet and increase demand for their material.  The complaint alleges that channels like Newsmax and OAN would have grown faster

29

and produced more, higher-quality content if Fox had not blocked or delayed their carriage.  *See* Areeda & Hovenkamp ¶ 1802c ("Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth."); *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191-92 (3d Cir. 2005) (disapproving of conduct that kept growth "below the critical level necessary for any rival to pose a real threat to [the monopolist's] market share.").  Fox's conduct artificially limits output by stopping or delaying the growth of competitors who would otherwise expand their reach and content offerings.

### C.      Fox Cherry-Picks Facts And Misconstrues Newsmax's Allegations

#### 1.      Supracompetitive pricing and reduced output

Fox claims (at 28-30) the complaint does not provide enough detail about alleged supracompetitive pricing.  Fox mischaracterizes the complaint, which claims Fox charges the highest carriage fees and distorts the tiering system with its anticompetitive agreements.  The complaint further alleges that "consumers in the Western District face supracompetitive prices" because of Fox's anticompetitive conduct, an all-but-inevitable outcome of the alleged facts.  Compl. ¶ 19.  Newsmax has no obligation at the pleading stage to include studies showing the overcharge and reduced competitive options.  Fox's suggestion (at 30) that its prices are high because of "subscriber demand" improperly asks the Court to draw inferences in its favor.  Despite high demand for right-leaning pay TV channels – meaning the market should be primed for robust competition – Fox faces minimal competition and can charge supracompetitive prices, harming consumers.  *See, e.g.*, Compl. ¶¶ 19, 51, 56, 80, 95.

Fox trivializes Newsmax's allegations as the loss of a single contract with a single purchaser.  Mot. at 32 (citing *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir. 1980)).  But the actual complaint identifies multiple distributors who have delayed carrying its channel or carried it on a worse tier because of Fox's bullying.  Compl. ¶¶ 57 (Fubo), 70 (Sling

TV), 85 (Hulu+, Mediacom); *see Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 947 (7th Cir. 2024) ("[A court's] job is to read the complaint as a whole, not to parse it piece by piece to determine whether each allegation, in isolation, is plausible." (cleaned up)).  Nor is the injury to competition limited to the harm to Newsmax.  Compl. ¶ 39.  Another competitor, OAN, has faced similar exclusion, and Fox may have successfully deterred other would-be competitors from entry.  *Id.* ¶ 70; *see id.* ¶ 60 (Fox has "prevented OAN from being carried on more than one major cable system").

Fox also ignores (at 31) how its conduct reduces output.  Its reliance on *Chicago Professional Sports Ltd. Partnership v. National Basketball Association*, 961 F.2d 667 (7th Cir. 1992), is inapt.  That case concerned which television stations could broadcast a predetermined set of NBA games.  *See id.* at 669-70.  Unlike the fixed number of basketball games in a season, the amount of right-leaning news content fluctuates according to demand and the availability of economically feasible carriage, which Fox has suppressed.  *See* Areeda & Hovenkamp ¶ 1802c; *Dentsply*, 399 F.3d at 191-92; *see also* Compl. ¶ 66 (Fox prevents Newsmax from creating new content with guests who appear on Fox).  It is thus unpersuasive to claim, as Fox does (at 31-32), that excluding Newsmax from only *some* distributors does not suppress output.  But for Fox's anticompetitive conduct, right-leaning pay TV providers would produce more content.  Compl. ¶ 66.

### 2.    Fox's secret anticompetitive contract provisions

Fox demands proof of the existence of its own contracts at the pleading stage, *see* Mot. at 20-22, 32-34, but the law does not.  *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("circumstantial evidence" can establish plausibility).  Because Fox keeps "key exclusionary provisions from the public eye" by burying them in "private, bilateral contracts," Compl. ¶ 82, Newsmax can properly rely upon "information and belief" to allege the existence

31

of exclusive carriage agreements and drag-down provisions. *See Carbone*, 621 F. Supp. 3d at 886 ("[P]laintiffs are permitted to make allegations on information and belief . . . especially . . . where, as in this case, the pleadings concern matters peculiarly within the knowledge of the defendants." (cleaned up)); *Columbia River*, 2019 WL 4850168, at *2 ("court of appeals has cautioned district courts against requiring plaintiffs to plead facts they can't be expected to know without discovery" when a company did not "have access to" other firms' "internal agreements"); *see also Olson v. Champaign Cnty.*, 784 F.3d 1093, 1100 (7th Cir. 2015).

Using the information available at this stage, the complaint describes how Fox leverages "strict confidentiality and nondisclosure provisions and . . . oral 'gentlemen's agreements' to avoid leaving discoverable paper trails" of its anticompetitive provisions. Compl. ¶ 82; *see also id.* ¶¶ 56, 60, 81, 85; Dkt. 36 at 7 (Fox moving for a stay of all discovery because "[t]he terms of carriage agreements are among the most closely guarded and sensitive business information for a programmer like Fox"). Discovery will unearth what Fox has sought to bury. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (complaint is plausible if it contains facts that "raise a reasonable expectation that discovery will reveal evidence" supporting the allegations); *Runnion*, 786 F.3d at 528-29 ("We cannot expect, nor does Federal Rule of Civil Procedure 8 require, a plaintiff to plead information she could not access without discovery."). Some aspects of Fox's carriage agreements have been described in publicly available testimony – including testimony elicited by counsel for Fox – as containing penetration requirements, packaging requirements, and drag rights. *See, e.g.*, Guzman Decl. Ex. 6 (Hearing Tr. at 327:22-328:24, 434:19-435:17, 698:8-18, 756:22-759:18, 880:21-881:25, *FuboTV Inc. v. Walt Disney Co.*, No. 1:24-cv-01363 (S.D.N.Y. Aug. 7-9, 2024), Dkt. Nos. 298, 300, 302; *see also supra* note 5.

32

Fox misreads (at 21) *Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022), in arguing the complaint fails because other reasons could exist for distributors' refusal to carry Newsmax.  A court may not dismiss a plausible claim simply because another plausible explanation may exist.  *See Hughes v. Northwestern Univ.*, 63 F.4th 615, 630 (7th Cir. 2023).  Fox's contracts harm competition in ways that are "neither economically nor structurally necessary for Fox's business," Compl. ¶ 62, raising "a reasonable expectation that discovery will reveal evidence" of anticompetitive contracts.  *Vasquez*, 40 F.4th at 587.  In any case, the *Marion Diagnostic* complaint failed because the claims were "simply not plausible."  29 F.4th at 350.  The plaintiffs (medical goods consumers) failed to explain how a conspiracy between the defendant and only two distributors (of many) increased prices "regardless of which distributor [plaintiffs] purchase[d] from."  *Id.*

Fox does not explain why Newsmax's allegations are implausible; it just conjures (at 21-22) other possible explanations.  Speculation about alternative possibilities does not negate the plausibility of Newsmax's allegations.  *See Hughes*, 63 F.4th at 630.

### 3.      Market foreclosure

The complaint refutes Fox's argument (at 23-24) that Newsmax fails to plead concrete facts supporting market foreclosure.  Newsmax alleges that Fox uses "exclusionary terms" and "abuses its monopoly power to foreclose competition in the Right-leaning Pay TV News Market," conduct that "foreclose[s] or delay[s] meaningful competition."  Compl. ¶¶ 81, 86.  Newsmax identifies distributors that do not carry Newsmax in a particular package or tier because of Fox's anticompetitive conduct, which reduces viewers' access.  *Id.* ¶ 57 (Fox used its leverage to ensure Fubo carried Fox News and not Newsmax in its new Sports/News Package).

33

Newsmax also pleads exclusion from carriage by certain distributors for long periods of time because of Fox. *E.g.*, *id.* (Fubo); *id.* ¶ 58 (Hulu+); *id.* (Sling TV); *id.* ¶ 60 (exclusion of OAN); *id.* ¶ 61 (Fox delayed Mediacom from carrying Newsmax and "other right-leaning news channels"). Fox argues (at 27) delay is distinct from foreclosure, but delaying competitors' growth results in a cognizable antitrust injury. *See* Areeda & Hovenkamp ¶ 1802c; *Conwood*, 290 F.3d at 790; *United States v. Microsoft Corp.*, 253 F.3d 34, 71 (D.C. Cir. 2001) (*per curiam*); *McWane, Inc. v. FTC*, 783 F.3d 814, 840 (11th Cir. 2015) (finding injury where plaintiff's growth was "meaningfully (and deliberately) slowed" even though it "was not completely excluded" from the market).

The suggested three-year duration of Fox's carriage contracts, even if true, does not undermine Newsmax's allegations of foreclosure. Short contract terms do not allay concerns about injury to competition when "switching costs" are "onerous," and companies cannot "switch away from the defendant's product to that of rivals" at the end of the short-duration contract. Areeda & Hovenkamp ¶¶ 1807b1, 1802g2. Newsmax alleges that Fox News is a must-have for distributors and Fox has monopoly power. Compl. ¶¶ 88, 94.

Fox's cases (at 25) are inapt, because they involved exclusive-dealing contracts in competitive markets. *See Paddock Publ'ns., Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 45, 47 (7th Cir. 1996) (short-term exclusive contracts that slowed plaintiffs' growth where "market [was] competitive"); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (short-term exclusive contracts where plaintiff was so big it could "[]not be kept out of the . . . market"); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 665-66 (7th Cir. 2004) (short-term exclusive contracts where plaintiff failed to establish market power). In contrast, the

34

difficulties channels like Newsmax and OAN have faced in gaining a foothold stem from Fox's monopoly, not their own failures to compete in an unrestrained market.

The complaint pleads facts explaining why Newsmax cannot use alternative distribution channels to reach viewers.  Compl. ¶¶ 30-31.  Given the concentration of pay TV distribution, Fox's restrictions on carriage foreclose access to a large share of viewers.[28]  Fox (at 26-27) relies on cases where plaintiffs, unlike Newsmax, failed to plausibly allege they lacked alternative distribution channels.  Fox's argument (at 26) that alternatives exist relies on evidence outside the complaint and on cases decided on the merits.  *See Omega Env't*, 127 F.3d at 1166-67 (plaintiffs "failed either to allege facts . . . or to produce evidence to withstand summary judgment"); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1218 (8th Cir. 1987) (reviewing denial of motions for directed verdict and judgment notwithstanding the verdict).  Fox's retreat to the merits only highlights the plausibility of the allegations.

Fox asserts (at 24) – incorrectly – that market foreclosure should be gauged by its share of distributors, not viewers.  Access to viewers is what Newsmax cares about and carriage by distributors is *how* Newsmax reaches viewers.  Compl. ¶¶ 30-31.  Viewer demand creates distributor demand; distributors want to carry high-demand channels because advertisers will pay more for space on popular programming.  *See id.* ¶ 33.  Viewers want alternatives to Fox, *see id.* ¶ 45, so in a competitive market, distributors would carry channels like Newsmax and viewers would watch them.  But this demand for competition has not reduced Fox's viewership – because Fox has used its "must have" status to impose carriage restrictions that prevent Newsmax from

---

[28] *See* Leichtman Rsch. Grp., *Research Notes: Actionable Research on the Broadband, Media & Entertainment Industries* 5 (2024), https://leichtmanresearch.com/wp-content/uploads/2024/03/LRG-Research-Notes-1Q-2024.pdf [https://perma.cc/2QDT-U4RQ] (roughly 15 distributors cover 96% of all subscribers to pay TV).

35

reaching viewers, leaving Fox News as the only option for many. *See id.* ¶¶ 56, 80, 94. Thus, market foreclosure is properly measured by looking at viewership, not distributors.

Fox misstates the standard by suggesting (at 23) Newsmax must plead that roughly 40-50% of the market is foreclosed. Those percentages apply when proving a Section 1 claim on the merits, not when pleading a violation. *See Microsoft*, 253 F.3d at 45, 70 (reviewing a district court's finding on the merits of a Section 1 violation). Plausibility is the correct standard at the pleadings stage.

### 4.        Fox's drag-down provisions are not procompetitive discounts

Fox seems to deny (at 32-33) that it imposes drag-down provisions, then argues that the carriage agreements are of harmless short duration. It alternatively explains that drag-down provisions are really just procompetitive discounts. Mot. at 34. These arguments fail. The complaint more than adequately alleges that Fox uses drag-down provisions to delay competitors or consign them to expensive, less popular tiers. Fox's suggestions that no such provisions exist, or that they do not operate the way the complaint alleges, simply argue factual issues that cannot be resolved in its favor on a motion to dismiss. Moreover, Fox goes to great lengths to keep its agreements with distributors out of the public realm, Compl. ¶ 82, so the complaint cannot be faulted for failing to cite them. But it bears mentioning that Fox's own counsel elicited public, in-court testimony last year confirming the existence of drag-down provisions in Fox's carriage agreements. *See supra* p. 32.

Fox's attempt to characterize drag-down provisions as discounts fares no better. The complaint alleges that various distributors would have carried Newsmax or OAN sooner or placed them on a better tier but for the drag-down provisions. Compl. ¶¶ 57, 58, 60, 61. These allegations are actionable, especially when an alleged monopolist demands exclusivity – directly

36

or indirectly. *See* Areeda & Hovenkamp ¶ 1802 (discussing how competitive harm flows from "exclusive-dealing or similar arrangements covering a significant portion of the downstream market"). Fox's citation to *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 997 (9th Cir. 2010), is misplaced because the company seeking exclusivity in that case was not a monopolist. *See id.* at 998. Rather, because the two competitors offered *functionally interchangeable* products, customers could entirely forgo the defendant's product and the exclusivity discount was an unobjectionable form of price competition. *See id.* at 997 (affirming summary judgment).

By contrast, Fox is a monopolist with a "must-have" channel. Compl. ¶¶ 33, 39, 46. Unlike in *Allied Orthopedic*, distributors cannot forgo Fox News and remain competitive – which is why Fox can impose high fees and demand carriage restrictions without losing business. No matter how low Newsmax's price or how good its content, distributors must still pick between paying the steep penalty Fox extracts or foregoing Newsmax. Exclusivity discounts offered by monopolists "effectively put[] the [customers] to the choice of either" using *only* the monopolist's product or not using it at all. Areeda & Hovenkamp ¶ 1807b1.

## III.    NEWSMAX PLAUSIBLY ALLEGES A SECTION 2 CLAIM

### A.    Fox's Monopoly Power And Exclusionary Conduct

A defendant violates Section 2 of the Sherman Act when it: (1) possesses "monopoly power in the relevant market" and (2) "engages in the willful acquisition or maintenance of that power" through exclusionary conduct. *Viamedia*, 951 F.3d at 451 (cleaned up). A plaintiff must also establish antitrust injury, *id.* at 481, which Newsmax has demonstrated. *See supra* pp. 28-30. Newsmax's allegations satisfy both remaining elements. A plaintiff can establish monopoly power in a relevant market either with direct evidence of anticompetitive effects or with evidence that "the defendant's share" in relevant product markets "exceeds whatever threshold is

37

important for the practice in the case." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000).  Newsmax's complaint alleges both.

*Market power:*  Fox has reduced output in the right-leaning Pay TV market.  Compl. ¶¶ 58, 60-61, 70.  Fox coerces distributors into exclusionary and restrictive carriage agreements to prevent other right-leaning news channels from reaching consumers, or make it financially impracticable to do so.  *Id.* ¶¶ 3, 52-62.  It prevented Sling TV from carrying Newsmax, ¶¶ 58, 70; Hulu+ from carrying Newsmax for nearly a decade, *id.* ¶ 58; major cable systems from carrying OAN, *id.* ¶ 60; and Mediacom from carrying Newsmax and other right-leaning news channels, *id.* ¶ 61; leaving those viewers with no choice besides Fox News, *id.* ¶ 70.  Fox requires distributors who place other right-leaning news channels in their basic tiers to carry, and pay prohibitively high fees for, low-demand Fox programming in that tier.  *Id.* ¶¶ 3, 52-62.  These provisions prevent distributors who wish to carry other right-leaning news channels from doing so entirely, or effectively impose "a direct financial penalty" if they do.  *Id.* ¶ 50.

Fox also charges supracompetitive prices including by charging exorbitant carriage fees and imposing financial penalties on distributors, costs that are passed on to consumers.  *Id.* ¶ 71 Fox News charges "significantly higher carriage fees than any other cable news channel," demanding "nearly double CNN's fees and almost *six times* those of MSNBC."  *Id.* ¶ 42.  Fox uses its monopoly power to impose additional fees on distributors for its unpopular channels, which are passed on to consumers.  *Id.* ¶ 71; *see* pp. 28-30.

Newsmax also alleges indirect evidence of market power in the form of high market share.  "[I]n the Seventh Circuit, it appears that market share north of 30% allows courts to infer market power."  *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 909 (N.D. Ill. 2023).  Newsmax alleges that Fox controls about 90% of the right-leaning Pay TV market as

of 2023.  Compl. ¶ 40.  Even taking the entire cable news landscape, Fox captures 65%.  *Id.* ¶ 43.

Media observers note that Fox News does not "have to respond to market forces"; it "earns so

much from carriage fees that even if Fox News received *no advertising revenue*, it would still

enjoy a profit margin of *over 35%*."  *Id.* ¶ 42 (emphases added).

***Exclusionary conduct:***  Such conduct includes "behavior that not only (1) tends to

impair the opportunities of rivals, but also (2) either does not further competition on the merits or

does so in an unnecessarily restrictive way."  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,

472 U.S. 585, 605 n.32 (1985) (quoting 3 P. Areeda & D. Turner, Antitrust Law 78 (1978)).

Fox's conduct reduced competition and impaired the opportunities of Newsmax and other rivals,

such as OAN.  Compl. ¶ 39.  It "stifl[ed] Newsmax's pay TV distribution, obstruct[ed] its

audience and ratings growth, [and] prevent[ed] Newsmax from reaching 'critical mass' for major

advertising and marketing revenues."  *Id.* ¶ 79.

Fox's behavior impedes competition on the merits.  Fox used strongarm tactics and harsh

financial penalties to stop competition before it could get off the ground.  DISH Network

"expressed a strong desire to carry Newsmax on its vMVPD" but did not because it would

trigger a financial penalty from Fox through forced carriage of additional unwanted Fox

channels.  *Id.* ¶ 58; *see MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 1278-79

(11th Cir. 1999) (finding anticompetitive effect where a TV show syndicator refused to license

several shows to a TV station unless the station also purchased another show it did not want).

Fox deployed a similar playbook against Mediacom.  Compl. ¶ 61.  Rather than let

Mediacom choose channels based on consumer demand or other factors, Fox threatened financial

penalties through forced carriage of unwanted channels if Mediacom carried Fox's competitors.

*See id*.; *United States v. Paramount Pictures*, 334 U.S. 131, 159 (1948) (condemning defendant's

39

"refusal to license one or more copyrights unless another copyright is accepted" because it "prevent[ed]" decisions based on the "individual merits" of products).  This delayed Mediacom's carriage of Newsmax and has "precluded other right-leaning news channels from being carried on Mediacom."  Compl. ¶ 61.  "Fox's conduct is neither economically nor structurally necessary for Fox's business," further underscoring its unnecessarily restrictive nature.  *Id.* ¶ 62.  Fox's dominance did not stem from having a better product, but from its abuse of its monopoly power.

**B.**      **Fox Mischaracterizes The Complaint And Misstates Controlling Law**

Fox suggests (at 21-22) that distributors did not carry Newsmax because its channels were not "attractive" to audiences, but internal communications suggest otherwise.  *See* Compl. ¶ 50 (Fox's internal recognition that Newsmax was a competitive threat).  If that were true, Fox would have no reason to use contractual and other bludgeons to stifle competition from Newsmax and OAN – the market would dispose of them.  Fox's use of anticompetitive contract provisions – combined with Fox's pattern of intimidating guests who appeared on Newsmax, *id.* ¶ 66, hiring private detective firms to investigate Newsmax's executives, *id.* ¶ 63, and repeatedly orchestrating targeted, online attacks of Newsmax and its executives, *id.* ¶¶ 63-66 – is strong circumstantial evidence that, in Fox's assessment, viewer and distributor demand were likely to continue fueling Newsmax's growth if the market remained free and competitive on the merits.

In arguing (at 37) that Newsmax fails to allege price increases attributable to Fox's anticompetitive conduct, Fox simply ignores allegations that it forced distributors to pay higher carriage fees and thereby charge supracompetitive prices that are passed on to consumers.  *See*, *e.g.*, Compl. ¶ 71.  High demand alone cannot explain why Fox was able to drive up carriage fees in the basic tier for distributors who wanted to carry Newsmax in that tier.

Fox argues (at 38) that carrying Fox does not require foregoing Newsmax.  But that is what Fox forced distributors to do when it demanded they agree to "no-carry" provisions, and

40

threatened them with having to carry unpopular Fox-owned channels and pay high fees if they carried Newsmax.  Compl. ¶ 3; *see also id.* ¶¶ 53-55.  Nor does the fact that distributors now carry Newsmax defeat market power allegations.  Under Section 2, "it is not necessary that all competition be removed from the market.  The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Dentsply*, 399 F.3d at 191 (dominant firm "slow[ed] the rival's expansion" thereby "keep[ing] sales of competing [product] below the critical level necessary for any rival to pose a real threat to Dentsply's market share") (quoting Areeda & Hovenkamp ¶ 1802c, at 64 (2d ed. 2002); and citing *LePage's Inc. v. 3M*, 324 F.3d 141, 159-60 (3d Cir. 2003)).

Fox's assertion (at 40-42) alleged that threats and intimidation aimed at Newsmax, other rivals, distributors, hosts, and guests are non-actionable misstates controlling legal principles.  Coercive threats and tactics that reinforce exclusionary contract provisions, deter counterparties from dealing with rivals, and suppress rivals' growth are part of a "larger anticompetitive scheme." *See Hytera Commc'ns Corp. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 879-80 (N.D. Ill. 2022) (coercion can be part of an exclusionary scheme, cognizable under the antitrust laws, "even if some alleged actions . . . are innocent standing alone").  Anticompetitive conduct includes behavior that impairs the opportunities of rivals, but "does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing*, 472 U.S. at 605 n.32.

Newsmax pleads a coherent course of conduct that fits this definition:  Fox imposed exclusionary agreements, penalties, and other punitive terms on distributors to prevent them from carrying right-leaning news competitors; deployed threats of sports blackouts to further manipulate carriage "negotiations"; punished on-air guests for appearing on Newsmax; and engaged in intimidation and smear tactics against Newsmax and its executives to chill

41

competitive activity and deter the news ecosystem from assisting Fox News's rivals.  Compl. ¶¶ 3, 46-58, 60-62, 64-67, 70-71, 79-81.

Fox's argument (at 41) that disparagement and coercion are not actionable mischaracterizes the complaint.  Newsmax pleads an integrated scheme in which threats, intimidation, and smear tactics are deployed to deter parties from dealing with competitors. Compl. ¶¶ 65, 66; *see Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980) (antitrust allegations "should be judged as a whole and not separately").  Fox's argument (at 41) that some allegations of threats and intimidation are "not even factual assertions" because they include allegations similar to those in other litigation also distorts the complaint.  Newsmax does not rely on others' allegations as a substitute for its own claims.  It pleads Fox's intimidation tactics directed at Newsmax, its executives, and its guests and links those tactics to Fox's suppression of distribution and output.  Compl. ¶ 63.  At this stage, Newsmax's detailed allegations of Fox's multifaceted anticompetitive scheme must be accepted as true, *see Mouradian*, 2024 WL 1675039, at *3, and are more than sufficient to raise a "reasonable expectation that discovery will reveal evidence" corroborating Fox's coercion and intimidation as part of the exclusionary scheme.  *Twombly*, 550 U.S. at 545; *Vasquez*, 40 F.4th at 587.

These tactics were "neither economically nor structurally necessary for Fox's business," reinforcing evidence of their anticompetitive character.  *See* Compl. ¶ 62.  Coercion and threats compel counterparties to adhere to exclusionary terms and intimidation campaigns directed at Newsmax deters others from dealing with them, impairing the growth of right-leaning programs and maintaining Fox's monopoly.  *See Nexstar Broad., Inc. v. Granite Broad. Corp.*, 2012 WL 2838547, at *8 (N.D. Ind. July 9, 2012) (holding "allegations of denigrating speech and predatory hiring" are "part of a course of conduct (or 'chain reaction') and show [defendant's]

intent to monopolize the television advertising market and destroy competition") (citing *DSM Desotech Inc. v. 3D Sys. Corp.*, 2009 WL 174989, at \*10 (N.D. Ill. Jan. 26, 2009)).

## IV.     IN THE INTEREST OF EFFICIENCY, NEWSMAX VOLUNTARILY WITHDRAWS ITS BLOCK-BOOKING CLAIMS

Fox's efforts to keep Newsmax out of the market are ongoing, and the cumulative injury Newsmax suffers from lost competitive opportunities are ongoing.  In the interest of narrowing the dispute and expediting the vindication of Newsmax's rights, however, Newsmax voluntarily withdraws its Third and Sixth causes of action for block-booking under federal and state law.[29] To be clear, Newsmax maintains that Fox's block-booking conduct is unlawful and injurious, but Newsmax is streamlining the counts by including the factual allegations as part of an anticompetitive strategy that Fox uses to maintain its monopoly under Section 2 of the Sherman Act and Section 133.03(2) of the Wisconsin Antitrust Act (the Second and Fifth causes of action).  *See supra* pp. 39-40; *see also Viamedia*, 951 F.3d at 474 (recognizing that tying can support a monopolization claim under Section 2).

## V.     NEWSMAX PLAUSIBLY ALLEGES STATE-LAW CLAIMS

Fox's motion to dismiss Newsmax's state-law claims fails for the same reasons it fails as to the federal claims.  *See Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 968-69 (W.D. Wis. 2017) (Conley, J.) ("Wisconsin courts traditionally look to federal law to interpret substantive violations of the Wisconsin antitrust statutes."); *State v. Waste Mgmt. of Wis., Inc.*, 261 N.W.2d 147, 155-56 (Wis. 1978) ("[W]hat amounts to a conspiracy in restraint of trade under the Sherman Act amounts to a conspiracy in restraint of trade under the Wisconsin antitrust act.").

---

[29] Newsmax will seek leave to amend its complaint to reflect the voluntary withdrawal of the Third and Sixth causes of action after the Court rules on the instant motion.

43

**CONCLUSION**

For the foregoing reasons, this Court should deny Fox's motion to dismiss.

Dated: May 12, 2026

Respectfully submitted,

By: *s/ Samuel J. Randall*
Samuel J. Randall (Florida Bar No. 0056864)
**SPERLING KENNY NACHWALTER LLC**
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Tel: (305) 373-1000
Email: srandall@sperlingkenny.com

Michael J. Guzman (*pro hac vice*)
**KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.**
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7910
Email: mguzman@kellogghansen.com

*Counsel for Plaintiff Newsmax Broadcasting, LLC*

44