# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

NEWSMAX BROADCASTING, LLC,

       *Plaintiff*,

    v.

FOX CORPORATION AND FOX NEWS
NETWORK, LLC,

       *Defendants*.

No. 3:25-cv-770

Hon. William M. Conley

## REPLY IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 3

I.    NEWSMAX'S CLAIMS ALL FAIL BECAUSE NEWSMAX HAS NOT PLAUSIBLY ALLEGED A RELEVANT MARKET. ...................................................... 3

    A.    Newsmax Fails Plausibly To Allege a Market Limited to the Distribution of "Right-Leaning News." .................................................................. 4

    B.    Newsmax Fails Plausibly To Allege a Market for Pay TV News. ...................... 10

II.    NEWSMAX FAILS PLAUSIBLY TO ALLEGE A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT. ....................................................................................... 11

    A.    Newsmax Fails To State a Claim Based on "Exclusive Carriage" Provisions...................................................................................................... 12

        1.    Newsmax Fails Plausibly To Allege Exclusive Carriage Terms Exist.... 12

        2.    Even If "Exclusive Carriage" Provisions Were Adequately Alleged, Newsmax's Allegations Describe Nothing More than Exclusive Dealing Arrangements that Do Not Violate Section 1............................. 15

            a.    Newsmax fails to plead facts suggesting substantial foreclosure of competition. .......................................................... 15

            b.    Newsmax fails to plead injury to competition. ............................ 19

                i.    Newsmax fails to allege supracompetitive increases to consumer prices. .......................................................... 19

                ii.    Newsmax fails plausibly to allege reduction in output. ............................................................................... 20

    B.    Newsmax Fails To State a Claim Based on "Drag Down" Provisions................ 22

        1.    Newsmax Fails Plausibly To Allege that "Drag Down" Provisions Exist. ................................................................................................ 22

        2.    So-Called "Drag Down" Provisions Fail To State a Claim in Any Event. ................................................................................................ 24

III.    NEWSMAX FAILS TO STATE A CLAIM FOR MAINTENANCE OF MONOPOLY POWER. ............................................................................................ 26

      A.      Newsmax Fails To Allege that Fox Has Monopoly Power in a Relevant Market. ................................................................................................. 26

      B.      Newsmax Fails To Allege Anticompetitive Conduct or Injury to Competition. .............................................................................................. 29

IV.    NEWSMAX'S ABANDONED BLOCK-BOOKING CLAIMS SHOULD BE DISMISSED. ........................................................................................... 31

V.     NEWSMAX'S STATE LAW CLAIMS SHOULD BE DISMISSED. .......................... 31

VI.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. ........................ 31

CONCLUSION ............................................................................................................. 32

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ...................................................................................24, 25

*Arista Recs., LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010)........................................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................14, 15

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985).................................................................................................29, 30

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
    15 F.4th 831 (7th Cir. 2021) ......................................................................................13

*Authenticom, Inc. v. CDK Global, LLC*,
    874 F.3d 1019 (7th Cir. 2017) ...................................................................................30

*Beaulieu v. Ashford Univ.*,
    529 F. Supp. 3d 834 (N.D. Ill. 2021) ..........................................................................5

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................... *passim*

*Bissessur v. Ind. Univ. Bd. of Tr.*,
    581 F.3d 599 (7th Cir. 2009) .......................................................................................5

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ...................................................................................21

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962).................................................................................................6, 8

*Carbone v. Brown Univ.*,
    621 F. Supp. 3d 878 (N.D. Ill. 2022) ..........................................................................9

*Cass Student Advert., Inc. v. Nat'l Educ. Advert. Serv., Inc.*,
    516 F.2d 1092 (7th Cir. 1975) ...................................................................................10

*In re Century Aluminum Co. Secs. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ...................................................................................15

*Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*,
    940 F.3d 971 (7th Cir. 2019) ...................................................................19, 20, 21, 30

*Chicago Professional Sports Ltd. Partnership v. NBA*,
　961 F.2d 667 (7th Cir. 1992) ............................................................................21

*Concord Boat Corp. v. Brunswick Corp.*,
　207 F.3d 1039 (8th Cir. 2000) ..........................................................................25

*Contractor Tool Supply, Inc. v. JPW Indus., Inc.*,
　785 F. Supp. 3d 1107 (M.D. Fla. 2025) ............................................................20

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
　703 F. Supp. 3d 862 (N.D. Ill. 2023) ...............................................................27

*Dixon v. Nat'l Hot Rod Ass'n*,
　450 F. Supp. 3d 831 (S.D. Ind. 2020) ................................................................4

*Dreamstime.com, LLC v. Google LLC*,
　54 F.4th 1130 (9th Cir. 2022) ..........................................................................27

*Ducere LLC v. Enbridge (U.S.) Inc.*,
　2025 WL 81373 (N.D. Ill. Jan. 13, 2025) ..............................................26, 27, 29

*Duffy v. Ticketreserve, Inc.*,
　722 F. Supp. 2d 977 (N.D. Ill. 2010) ..................................................................5

*FTC v. Facebook, Inc.*,
　560 F. Supp. 3d 1 (D.D.C. 2021) ......................................................................27

*FTC v. Meta Platforms, Inc.*,
　2025 WL 3458822 (D.D.C. Dec. 2, 2025)......................................................7, 27

*FTC v. Meta Platforms Inc.*,
　654 F. Supp. 3d 892 (N.D. Cal. 2023) ................................................................8

*FTC v. Qualcomm, Inc.*,
　969 F.3d 974 (9th Cir. 2020) ......................................................................29, 30

*Glob. Disc. Travel Servs., Inc. v. Trans World Airlines, Inc.*,
　960 F. Supp. 701 (S.D.N.Y. 1997) .....................................................................7

*GreenCycle Paint, Inc. v. PaintCare, Inc.*,
　250 F. Supp. 3d 438 (N.D. Cal. 2017) ..............................................................14

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Practices, & Antitrust
　Litig.*,
　151 F.4th 922 (7th Cir. 2025) ...................................................................8, 9, 17

*Haywood v. Massage Envy Franchising*,
　LLC, 887 F.3d 329 (7th Cir. 2018)....................................................................31

*Hennessy v. Penril Datacomm Networks, Inc.*,
    69 F.3d 1344 (7th Cir. 1995) ........................................................................................6

*Hesse v. Godiva Chocolatier, Inc.*,
    463 F. Supp. 3d 453 (S.D.N.Y. 2020)............................................................................6

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ...............................................................................3, 4, 11

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018) ...............................................................................16

*Hughes v. Northwestern University*,
    63 F.4th 615 (7th Cir. 2023) ......................................................................................14

*Hytera Commc'ns Corp. v. Motorola Sols., Inc.*,
    623 F. Supp. 3d 857 (N.D. Ill. 2022) .........................................................................30

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ...................................................................................27

*Inguran, LLC v. ABS Global, Inc.*,
    2023 WL 5254780 (W.D. Wis. Aug. 14, 2023)...........................................................21

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
    2016 WL 264909 (D. Del. Jan. 21, 2016)....................................................................18

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ...........................................................................3, 14, 20

*James Cape & Sons Co. v. PCC Constr. Co.*,
    453 F.3d 396 (7th Cir. 2006) .....................................................................................31

*Le v. Zuffa, LLC*,
    216 F. Supp. 3d 1154 (D. Nev. 2016)............................................................................9

*In re Local TV Advert. Antitrust Litig.*,
    2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ...............................................................10

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
    2023 WL 6811871 (D. Or. Oct. 13, 2023)....................................................................27

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ......................................................................................14

*In re McCormick & Co. v. Pepper Prods. Mktg. & Sales Prac. Litig.*,
    275 F. Supp. 3d 218 (D.D.C. 2017)............................................................................20

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
   937 F.3d 1056 (7th Cir. 2019) ........................................................................................19

*McMahon v. Bumble Bee Foods LLC*,
   148 F. Supp. 3d 708 (N.D. Ill. 2015) ..............................................................................23

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
   354 F.3d 661 (7th Cir. 2004) ..........................................................................................17

*Miller v. Nicholas*,
   2021 WL 9037639 (E.D.N.Y. Nov. 3, 2021).....................................................................30

*My Health, Inc. v. Gen. Elec. Co.*,
   2015 WL 9474293 (W.D. Wis. Dec. 28, 2015) ...................................................................6

*Nexstar Broad., Inc. v. Granite Broad. Corp.*,
   2012 WL 2838547 (N.D. Ind. July 9, 2012) ...............................................................30, 31

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018)........................................................................................................26

*OJ Commerce, LLC v. Nat'l Christmas Prods., LLC*,
   2025 WL 1510906 (S.D. Fla. Apr. 25, 2025) ..................................................................20

*Omega Env't, Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ...................................................................................17, 25

*Organ Recovery Sys., Inc. v. Pres. Sols., Inc.*,
   2012 WL 2577500 (N.D. Ill. July 4, 2012)......................................................................29

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
   630 F. Supp. 3d 968 (N.D. Ill. 2022) ..............................................................................14

*Paddock Publ'ns, Inc. v. Chi. Trib. Co.*,
   103 F.3d 42 (7th Cir. 1996) ............................................................................................17

*Pepsico, Inc. v. Coca-Cola Co.*,
   1998 WL 547088 (S.D.N.Y. Aug. 27, 1998).....................................................................11

*Photovest Corp. v. Fotomat Corp.*,
   606 F.2d 704 (7th Cir. 1979) ..........................................................................................11

*PNY Techs., Inc. v. SanDisk Corp.*,
   2014 WL 2987322 (N.D. Cal. July 2, 2014).....................................................................18

*Roland Mach. Co. v. Dresser Indus., Inc.*,
   749 F.2d 380 (7th Cir. 1984) ...............................................................................17, 19, 20

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009)........................................................................31

*Se. Mo. Hosp. v. C.R. Bard, Inc.*,
  642 F.3d 608 (8th Cir. 2011) .....................................................................................25

*Silverman v. Motorola, Inc.*,
  2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) .............................................................6

*Simonian v. Edgecraft Corp.*,
  2010 WL 3781262 (N.D. Ill. Sept. 20, 2010) ...........................................................13

*Siva v. Am. Bd. of Radiology*,
  512 F. Supp. 3d 864 (N.D. Ill. 2021), *aff'd*, 38 F.4th 569 (7th Cir. 2022) ...............14

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999).........................................................................................9

*Spinelli v. Nat'l Football League*,
  903 F.3d 185 (2d Cir. 2018)..........................................................................19, 20, 29

*In re Tecfidera Antitrust Litig.*,
  791 F. Supp. 3d 852 (N.D. Ill. 2025) ........................................................................15

*Thomason v. Nachtrieb*,
  888 F.2d 1202 (7th Cir. 1989) .....................................................................................5

*United States v. Bertelsmann SE & Co.*,
  646 F. Supp. 3d 1 (D.D.C. 2022) ..............................................................................10

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024)...............................................................................27

*United Wholesale Mortgage, LLC v. America's Moneyline, Inc.*,
  2025 WL 502743 (E.D. Mich. Feb. 14, 2025)............................................................3

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)...................................................................................................29

*Wertymer v. Walmart, Inc.*,
  142 F.4th 491 (7th Cir. 2025) ......................................................................................5

**Other Authorities**

Fed. R. Civ. P. 12(f).........................................................................................................31

**INTRODUCTION**

Newsmax's opposition confirms that this case should be dismissed. It makes clear that Newsmax's claims amount to nothing more than legally insufficient assertions of a made-up market coupled with conclusory, fact-free allegations about supposed terms in Fox's carriage contracts, topped off with no factual allegations at all to show any injury to competition. The complaint is simply an attempt to blame Newsmax's failure to attract viewers on imagined anticompetitive behavior by Fox, without any facts in support. It ignores the Supreme Court's direction in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), that antitrust plaintiffs must plead sufficient *facts* to make an alleged antitrust violation not merely *possible* but *plausible*. Newsmax fails to cross that threshold. Among the many deficiencies in the complaint, the opposition makes three stand out.

*First*, the complaint is devoid of the factual allegations necessary to plead critical elements of Newsmax's antitrust claims. Despite claiming that Fox has exclusive carriage contracts with distributors, Newsmax does not allege that a single distributor refuses to carry Newsmax. To the extent Newsmax alleges "delays" in carriage, they involved only four distributors (Fubo, Hulu+, Sling TV, and Mediacom), and Newsmax does not allege any facts about how long the alleged delays lasted. Newsmax also fails to allege any facts to indicate how many distributors there are in the relevant market or how many subscribers are covered by each distributor—especially the four distributors that allegedly "delayed" carrying Newsmax. Newsmax does not and cannot dispute that all of this information is missing from the complaint. As a result, Newsmax asks the Court to proceed with an antitrust case based on the conclusory assertion that, for an unspecified period of time, Newsmax was "delayed" in securing carriage on four distributors that account for an unspecified share of the market. That is wholly insufficient to state any claim. Contrary to the

-1-

tacit assumption underpinning Newsmax's arguments, the antitrust laws do not guarantee Newsmax 100% carriage on every distributor.

*Second*, Fox has explained that Newsmax's reliance on viewership data cannot show market foreclosure or monopoly power in the market Newsmax has alleged. *Viewership* does not measure any share in the alleged market for "*distribution* of right-leaning pay TV news." Compl. ¶ 68 (emphasis added). Transactions in that market are between programmers and distributors— not programmers and viewers—and shares in the alleged market turn on how many subscribers a programmer can reach through its carriage agreements with distributors, not how many subscribers choose to watch a channel. In response, Newsmax essentially concedes that Fox's analysis is right. Newsmax admits that "[a]ccess to viewers is what Newsmax cares about" and that "carriage by distributors is *how* Newsmax reaches viewers." Opp. 35. But *access* to viewers (and thus shares in the distribution market) is measured by whether Newsmax has a carriage contract with a distributor and how many subscribers receive Newsmax's channel with their tier of service. How many subscribers actually *watch* Newsmax (viewership) is not a measure of market *access*. Even if Newsmax has unimpeded *access* to viewers—and the allegations in the complaint suggest it does—it could still have low *viewership* because subscribers simply choose not to watch Newsmax.

Newsmax's mistaken focus on viewership highlights that Newsmax fails to make any plausible allegations about market foreclosure or Fox's purported monopoly power. The complaint and opposition reflect Newsmax's dissatisfaction with its low *viewership* results. But a programmer's inability to attract viewers—despite having *access* to them—is not an injury to competition and does not give rise to a Sherman Act Claim.

*Third*, much of Newsmax's brief reads more like a motion to amend the complaint than a defense of it. Fox pointed out that the complaint provides no factual allegations on multiple points

essential for Newsmax's claims.  In response, Newsmax attaches a host of *new* material to its brief and cites additional articles in an effort to supply facts that were never pleaded.  Newsmax invokes this new-found material to plug gaps in the factual allegations in the complaint on everything from substitutability between "right-leaning news" and other cable news, to the size of the distribution market, to the existence of so-called "drag-down" provisions in Fox's carriage contracts.  Newsmax even advances a new theory of antitrust injury based on "reduced output" that appears nowhere in the complaint.  Newsmax now claims it would have produced more hours of programming but for the alleged "delay" in carriage on four distributors.  *See infra* p. 22.  All these efforts to introduce new factual allegations—or new theories on elements of Newsmax's antitrust claims—are impermissible.  Having failed to plead these facts, Newsmax cannot salvage its claims by treating its opposition as if it were an amended complaint.  And, as explained below, the new material fails to remedy the defects in the complaint in any event.

The complaint should be dismissed with prejudice.

## ARGUMENT

### I.  Newsmax's Claims All Fail Because Newsmax Has Not Plausibly Alleged a Relevant Market.

Newsmax cannot avoid scrutiny of its deficient market-definition allegations by arguing (Opp. 10) that market definition is a "factual inquiry" that should be postponed for later.  Courts routinely reject that argument "because it would absolve [plaintiffs] of the responsibility under *Twombly* to plead facts 'plausibly suggesting' the relevant []market's composition."  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010); *see also, e.g.*, *United Wholesale Mortgage, LLC v. America's Moneyline, Inc.*, 2025 WL 502743, at *5 (E.D. Mich. Feb. 14, 2025).  Because Newsmax fails to plead facts to support the extraordinarily narrow market it proposes, all of its claims fail.  *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–23 (9th Cir. 2018).

A.     **Newsmax Fails Plausibly To Allege a Market Limited to the Distribution of "Right-Leaning News."**

Newsmax fails to identify any factual allegations plausibly suggesting a distinct market for right-leaning news. Newsmax claims (Opp. 10) that it "alleges quantitative facts about consumer substitution," but offers no citation to the complaint. That is because the complaint contains no such "quantitative facts." Instead, Newsmax points (Opp. 11) only to a conclusory assertion that right-leaning viewers "demonstrate minimal switching to non-right-leaning news outlets," Compl. ¶ 30, which simply restates the definition of a market. *Dixon v. Nat'l Hot Rod Ass'n*, 450 F. Supp. 3d 831, 853 (S.D. Ind. 2020) (allegation that "products or services provided in this market are not reasonably interchangeable with products in other markets" is "conclusory antitrust terminology"). It is identical to the assertion in *Hicks* that purchasers "will not switch" to other products—which was held *insufficient* to sustain a claim. 897 F.3d at 1122. As *Hicks* explained, it is not enough to "merely restate a test for market definition without any factual elaboration." *Id.*[1]

The key source Newsmax cited to support its alleged market definition actually *undermines* Newsmax's claims. The Pew Survey Newsmax cited (Compl. ¶ 31 & nn.4–5) says that, while "[t]he perception is that because of their distinct identities . . . the cable news channels appeal to different, politically segmented audiences," the reality is that "the data show something different." Dkt. 32-4 at 6.[2] Newsmax cannot now ask the Court (Opp. 21) to ignore that study by claiming it is not "central" to Newsmax's claims. It was cited as the basis for key assertions Newsmax made

---

[1] The allegation that, after the November 2020 election, Fox was "'not concerned with losing market share to CNN or MSNBC *right now*,'" (Opp. 11 (emphasis added) (quoting Compl. ¶ 50)), further *undermines* Newsmax's market definition. It confirms that, outside the unusual circumstances after the 2020 election, Fox News typically *is* concerned about losing market share to competitors such as CNN and MSNBC—which shows that they are in the same market and that Fox News does not exist in a separate, insulated market for "right-leaning" news.

[2] Citations to exhibits refer to the page numbers generated by the Court's ECF system and not to any internal pagination.

in support of its market definition. *See* Compl. ¶ 31 & nn.4–5. It was thus "central" to Newsmax's claims and incorporated in the complaint, and the Court must credit it over contrary characterizations in briefing. *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 498–500 (7th Cir. 2025).

Newsmax tries to bolster its deficient allegations with a raft of *new* articles. *See* Opp. 12–13 & n.5; *see also* Dkt. 41-1–41-5. But Newsmax "may not supplement or amend [its] complaint by presenting new facts or theories in [its] briefing in opposition to a motion to dismiss." *Duffy v. Ticketreserve, Inc.*, 722 F. Supp. 2d 977, 990 (N.D. Ill. 2010); *see Bissessur v. Ind. Univ. Bd. of Tr.*, 581 F.3d 599, 603 (7th Cir. 2009); *Beaulieu v. Ashford Univ.*, 529 F. Supp. 3d 834, 845 (N.D. Ill. 2021) (declining to consider seventeen exhibits attached to opposition). The new articles are more than "elaborations" that are "consistent" with earlier "factual allegations." Opp. 12 n.5. They are an attempt to patch holes and amend the complaint to supply factual allegations and legal theories where previously none existed. That is not permissible under Seventh Circuit law. *See Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989).

The new articles do not help Newsmax in any event. One explains that "half or more of Fox News viewers are not Republican primary voters," meaning that Democrats and independents are a large share of Fox News's audience. Dkt. 41-1 at 9. It also suggests that large shares of MSNBC's and CNN's audiences are "right-leaning" or independent viewers. *Id.* That does not support any claim of a separate "right-leaning news" market; it further undermines that theory.

Newsmax also cannot walk away from all the statements it made to the SEC in its Offering Circular about how its "primary competition" comes from "FOX News, CNN, HLN, MSNBC and NewsNation," as well from "free-to-air broadcast television networks" and "online" news sources, which include "lower cost alternatives, including direct-to-consumer offerings." Dkt. 32-1 at 8, 12. The SEC Offering Circular is cited in the complaint itself (Compl. ¶ 73 n.40) and may be

considered on this motion.[3] And even if Newsmax had not relied on the Offering Circular in the complaint, the Court may take notice of Newsmax's SEC filings. Newsmax suggests (Opp. 19–20) that it disputes the truth of the statements it filed with the SEC, but the "*authenticity*" of those statements "is not in dispute and it is capable of accurate and ready determination." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) (emphasis added) (quotation omitted). *My Health, Inc. v. General Electric Co.*, 2015 WL 9474293 (W.D. Wis. Dec. 28, 2015), is thus inapposite, because the point there was that the *historical* contents of websites required authentication, *id.* at *4. And *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir. 1995), is also off-point. That case involved an SEC filing in which "the fact in question"— the number of a company's employees—"was not capable of accurate and ready determination" because the filing provided an employee count that included divisions of a company not relevant to the dispute. *See id.* at 1355. Newsmax also cannot dismiss its own statements to investors and the SEC on the ground that "none of [them] were intended to describe an antitrust market." Opp. 19. That misses the point. When it was required to make accurate disclosures to investors about its competitors, Newsmax described CNN, HLN, and MSNBC as part of its "primary competition." Dkt. 32-1 at 8. That admission fatally undermines the conclusory assertions in the complaint that Newsmax exists in an insulated market for "right-leaning news" and shows that such a purported market does not reflect commercial reality.

Newsmax fares no better (Opp. 15–18) arguing that it has alleged the "practical indicia" of a submarket identified in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). To start, there are no allegations suggesting "industry or public recognition" of a submarket. *Id.* Newsmax does not dispute that the only standard industry measure of viewership—Nielsen ratings—tracks

---

[3] *See, e.g., Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *1 (N.D. Ill. Sept. 23, 2008).

data solely for "cable news," not for "right-leaning news," thus *undermining* any submarket claim. *See* Mot. 13. Newsmax's self-serving assertions about how *it* views the market (Opp. 15 (citing, *e.g.*, Compl. ¶ 44)) are irrelevant; a plaintiff's subjective framing does not show an antitrust market.

Nor do purported "peculiar characteristics" of the alleged submarket (Opp. 16) support Newsmax's claim. They amount to nothing more than ideological content differences—*i.e.*, "different types of programming." *Id.* at 17. That does not suggest an economic submarket for "right-leaning news" any more than one ice cream manufacturer's focus on particular flavors would create a separate product market for chocolate ice cream. The "peculiar characteristics" factor looks to "physical or functional differences that make [products] less likely to be interchangeable," *FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *29 (D.D.C. Dec. 2, 2025), not idiosyncratic distinctions in consumer tastes.[4] And Newsmax's assertion that "right-leaning news" relies on "well-known media personalities," (Opp. 17–18 (citing Compl. ¶¶ 22, 29)), offers no distinction from other cable news at all. CNN and MSNBC have their own well-known personalities. What Newsmax's allegations describe is nothing more than product differentiation—variations in products designed to appeal to particular consumers. But it is well settled that product differentiation does not create different product markets. *See, e.g.*, Areeda & Hovenkamp ¶ 563d (a "differentiated product within a product class is presumptively not a separate market").[5]

---

[4] *See Glob. Disc. Travel Servs., Inc. v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) (noting that any given consumer may choose "Pepsi because she prefers the taste, or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.,'" but that for antitrust purposes "Pepsi is one of many sodas, and NBC is just another television network").

[5] *See also* Areeda & Hovenkamp ¶ 563a ("Products are differentiated when many buyers regard them as different though the products still perform the same essential function.").

There are also no allegations to suggest "distinct prices" for "right-leaning" news. The assertion (Opp. 17) that "[c]onsumers pay higher prices for bundled pay TV packages" than for direct-to-consumer offerings applies equally to *all* cable news. And while Newsmax alleges that Fox News can charge higher prices, Compl. ¶ 42, that suggests only a single-brand premium, not a submarket. If there were distinct pricing for a "right-leaning news" submarket, Newsmax could charge more than "left-leaning" networks—which it cannot. *See, e.g.*, *In re Harley-Davidson Aftermarket Parts Mktg., Sales Practices, & Antitrust Litig.*, 151 F.4th 922, 934–35 (7th Cir. 2025) (insufficient allegations of distinct pricing to support a submarket of American-made motorcycles where only one American brand could demand premium price).

On the last *Brown Shoe* factor, Newsmax's suggestion (Opp. 17–18) that "right-leaning news" uses a "specialized set of vendors" because it relies on "on-air talent" is absurd. CNN and MSNBC equally employ well-known personalities (*e.g.*, Anderson Cooper, Rachel Maddow). In any event, the real "vendors"—the entities that buy and deliver news channels to consumers—are MVPDs and vMVPDs, which are the *same* for all cable news. Nothing about the way "right-leaning news" is distributed to consumers suggests a distinct submarket. *See, e.g.*, *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 919 (N.D. Cal. 2023) ("The ['specialized vendor'] factor considers whether a product's distribution requires vendors with specialized knowledge or practices.").

Nor can Newsmax dismiss the Seventh Circuit's decision in *Harley-Davidson* as an inapplicable "outlier." Opp. 22–24. The plaintiff in *Harley-Davidson* sought to define a market for American-made motorcycles based on "distinct customers"—that is, "idiosyncratic preferences" of a subgroup of customers—which the Seventh Circuit held legally insufficient. 151 F.4th at 934. As the court explained, in product-differentiated markets, there is often a set of customers with

preferences that align them closely to a particular brand or type of differentiated product. But that customer preference does not create a separate product market. *Id.*; *accord SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999). The same analysis applies here.

Moreover, just as in *Harley-Davidson*, Newsmax's complaint fails to allege "peculiar characteristics and uses, unique production facilities, or specialized vendors," 151 F.4th at 934, to support its purported submarket. Nor can Newsmax distinguish *Harley-Davidson* on the ground that the allegations there were more consistent with a defective "single-brand submarket." Opp. 23. In *Harley-Davidson*, the allegations suggested higher prices solely for Harley-Davidson motorcycles, not all American-made motorcycles, and similarly indicated particular customer loyalty to the Harley-Davidson brand, not to "American-made motorcycles more generally." 151 F.4th at 934. The complaint here suffers from parallel defects. It suggests only that Fox News commands higher charges and a set of core viewers dedicated to Fox News. Compl. ¶¶ 42–43. Under *Harley-Davidson*, such allegations cannot and do not plausibly suggest a submarket for "right-leaning news."

Finally, Newsmax has no response to the fatal problems created by a market definition as nebulous as "right-leaning news." *See* Mot. 15–16. Newsmax fails to offer a word to explain how this Court could possibly decide what counts as a "right-leaning" viewpoint to define the contours of this supposed market and only exacerbates the problem by suggesting that "right-leaning" networks can be identified by their focus on issues such as "the economy, taxes, immigration, and terrorism" as opposed to "abortion and ethnicity." Opp. 17 & n.21. Newsmax's cases (Opp. 24) are irrelevant because they involved objective, commercial metrics for defining a market.[6]

---

[6] The market for "Elite, Private Universities" was based on magazine rankings, *Carbone v. Brown Univ.,* 621 F. Supp. 3d 878, 889 (N.D. Ill. 2022); the "live Elite Professional MMA" market was linked to objective UFC designations of fighters, *Le v. Zuffa, LLC,* 216 F. Supp. 3d 1154, 1165–

Newsmax also misunderstands the First Amendment concerns with a market definition that requires classifying the ideological viewpoint of speech. The cases Newsmax cites (Opp. 25–26) involved applying the antitrust laws to media markets, but the similarity ends there. Those markets were defined by neutral economic characteristics, not by a publisher's alleged editorial viewpoint. Here, by contrast, Newsmax is asking the Court not only to define a market based on the ideological viewpoint of speech, but also to shoulder the ongoing burden of policing the contours of a permanent injunction based on assessments of which networks count as providing "right-leaning" news. That project would require the Court to impose restrictions on Fox's conduct (Fox's contractual arrangements with distributors) based on the content of Fox's speech and to police the ongoing scope of those restrictions based on whether the viewpoint of *other* publishers' speech makes them part of the same "right-leaning news" market. That is not a task a court can perform consistent with the First Amendment. No court has ever attempted such a task. That is why Newsmax cannot point to any antitrust decision recognizing a market defined by the viewpoint of speech. Instead, they all delineated markets based on neutral grounds. *See, e.g.*, *Cass Student Advert., Inc. v. Nat'l Educ. Advert. Serv., Inc.,* 516 F.2d 1092, 1099 (7th Cir. 1975) (finding newspapers to be "a distinct communications medium"); *In re Local TV Advert. Antitrust Litig.,* 2020 WL 6557665, at *12 (N.D. Ill. Nov. 6, 2020) (distinguishing "broadcast television spot advertising" from "digital media advertising").

### B. Newsmax Fails Plausibly To Allege a Market for Pay TV News.

Newsmax also cannot plausibly limit the market to "pay TV news" because consumers can equally receive video news from direct-to-consumer (DTC) streaming offerings like Newsmax+. *See* Mot. 17. Newsmax cannot avoid that conclusion on the theory that "[s]eparate distribution

---

66 (D. Nev. 2016); and the "anticipated top-selling books" market was tied to projected sales of $250,000, *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 25 (D.D.C. 2022).

methods may reflect multiple submarkets for 'nearly identical' end products when consumers receive a different 'total service.'" Opp. 22 (citing *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 714 (7th Cir. 1979); *Pepsico, Inc. v. Coca-Cola Co.,* 1998 WL 547088, at \*7–12 (S.D.N.Y. Aug. 27, 1998)). Newsmax's cases are inapposite. Getting photos processed at a drive-thru kiosk is more convenient than going to a store, *Photovest*, 606 F.2d at 714, and getting a soda at a fast-food restaurant is meaningfully distinct from buying a can at a store, *Pepsico*, 1998 WL 547088, at \*7–12. But Newsmax has not alleged any facts plausibly suggesting how consuming video news via a direct-to-consumer service is meaningfully different from consuming the same video news via cable TV. Direct-to-consumer viewers receive a "visual and auditory" "curated presentation of tailored news stories" from a "large[] budget" channel that "provide[s] high[-]quality programming." Opp. 15.

*Hicks* is thus squarely on point. *See* 897 F.3d 1109. In *Hicks*, at the motion to dismiss stage, the court rejected an attempt to define a market that excluded golf-related advertising beyond "in-action" advertising without a plausible basis for doing so. *Id.* Here, even accepting that live, high-quality, video news is not interchangeable with other news formats, Newsmax has not plausibly explained why live, high-quality, video news that is not cable TV—like DTC offerings—ought to be excluded from the market. That alone provides a basis for dismissing the complaint.

## II. Newsmax Fails Plausibly To Allege a Claim Under Section 1 of the Sherman Act.

Newsmax fails plausibly to allege that Fox's carriage agreements contain either the supposedly exclusive dealing terms or the so-called "drag-down" provisions that form the basis for Newsmax's claims. And even if Newsmax could cross that hurdle, it fails to allege foreclosure of competition and antitrust injury as required to state a claim under Section 1 of the Sherman Act. Nothing in Newsmax's opposition dispels these fatal defects.

**A.**       **Newsmax Fails To State a Claim Based on "Exclusive Carriage" Provisions.**

**1.**       **Newsmax Fails Plausibly To Allege Exclusive Carriage Terms Exist.**

Newsmax offers virtually no response to the straightforward point (Mot. 20–22) that the complaint does not contain a single factual allegation plausibly suggesting that Fox's carriage agreements contain exclusive dealing terms. The only purported support cited in the complaint itself is an article from *The Guardian*, *see* Compl. ¶ 52 n.24, but that article says nothing at all about such terms. The complaint does not name a *single* distributor that has refused to carry Newsmax due to an exclusive carriage agreement with Fox (Mot. 23–24), and it alleges that Newsmax is carried by at least DirecTV, DISH, Hulu+, and YouTube TV, Compl. ¶ 6; Fubo, *id.* ¶ 57; Sling TV, *id.* ¶ 58; and Mediacom, *id.* ¶ 61. In addition, Newsmax's Offering Circular—cited in the complaint (*id.* ¶ 73 n.40)—confirms the same point and expands the list of distributors by admitting that "the Newsmax channel is carried by major cable and satellite distributors in the U.S., including *but not limited to*, DirecTV, Dish, Comcast/Xfinity, Charter/Spectrum and Verizon." Dkt. 32-1 at 7 (emphasis added). To the extent the complaint alleges *delayed* carriage on four distributors (Fubo, Sling TV, Hulu+, and Mediacom), as Fox explained (Mot. 21), the complaint attributes that delay to so-called "drag-down" provisions, not exclusive carriage terms. Newsmax does not contest any of those points. And while Newsmax improperly tries to amend its complaint by attaching about a half-dozen new articles to its brief, those sources also make no mention of exclusive carriage terms.

Lacking any factual allegations to support the existence of exclusive carriage terms, Newsmax offers theories to excuse itself from alleging any facts. Those arguments are meritless, and the complaint fails to allege the existence of exclusive dealing terms as a matter of law.

*First*, Newsmax cannot evade *Twombly*'s pleading requirements by tacking "on information and belief" onto conclusory allegations about terms in Fox's carriage agreements. *See*

Opp. 31–32. *Twombly* itself rejects that approach. In *Twombly,* the plaintiff pointed to parallel behavior by the defendants and alleged, "upon information and belief," that there must be an antitrust conspiracy. 550 U.S. at 551. The Supreme Court rejected that, explaining that the facts alleged were "merely consistent with" a conspiracy, but that "further factual enhancement" was required to cross "the line between possibility and plausibility." *Id.* at 557; *see also id.* ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").[7] Put simply, an antitrust plaintiff like Newsmax cannot allege that it has had slower growth than expected upon entering a new market and, without more, jump to the conclusion that its performance must be due to imagined secret terms in a competitor's contracts or "oral 'gentlemen's agreements.'" And that failure of pleading is not cured by Newsmax incanting the words "on information and belief" before making speculative assertions unsupported by facts. *See Simonian v. Edgecraft Corp.*, 2010 WL 3781262, at *3 (N.D. Ill. Sept. 20, 2010) (pleading based on information and belief must "set[] forth the specific facts upon which the belief is reasonably based").

*Second*, Newsmax fares no better claiming (Opp. 32) that "[d]iscovery will unearth" support for its speculation. That gets things backwards. Newsmax must plausibly allege a claim *before* it gets discovery. "*Twombly* bars the discover-first, plead-later approach." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021).

*Third*, Newsmax asks the Court (Opp. 33) to ignore *Twombly* by arguing that the Court should disregard the fact that the allegations in the complaint are equally or more consistent with

---

[7] *See also Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("Because the *Twombly* complaint's factual allegations described only actions that were . . . consistent with lawful conduct, the conclusory allegation on information and belief that the observed conduct was the product of an unlawful agreement was insufficient to make the claim plausible.").

entirely lawful, independent decisions by distributors—rational decisions that Newsmax was simply not that useful in attracting viewers. *Twombly* requires courts to consider such alternatives, and held that, where a complaint alleges facts that make an unlawful agreement merely *possible*, while other alternatives are equally or more likely, it fails to cross the threshold of *plausibility* and instead "stays in neutral territory." 550 U.S. at 557, 567. Accordingly, it is settled law in the Seventh Circuit that, under *Twombly*, "courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022); *see also In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 984 (N.D. Ill. 2022) ("Factual allegations that are equally consistent with a wide range of lawful, independent business conduct as they are with an anticompetitive agreement are insufficient." (citation omitted)); *Siva v. Am. Bd. of Radiology*, 512 F. Supp. 3d 864, 867 (N.D. Ill. 2021), *aff'd*, 38 F.4th 569 (7th Cir. 2022) (same).[8]

Nothing in *Hughes v. Northwestern University*, 63 F.4th 615 (7th Cir. 2023), allows Newsmax to avoid that straightforward rule. *Hughes* addressed a different situation in which the complaint contained sufficient facts to *plausibly* allege a breach of fiduciary duty, and the court rejected the assertion that plaintiff was required to rule out "every *possible* alternative explanation" for the fiduciary's conduct. *Id.* at 629 (emphasis added). That analysis is irrelevant here, where Newsmax has failed to provide sufficient factual allegations to "nudge" its claims "across the line

---

[8] *See also, e.g.*, *Tempur-Pedic*, 626 F.3d at 1342 (where behavior described in the complaint is "fully explained" by rational, independent behavior, a plaintiff "ha[s] the burden to present allegations showing why it is more plausible that" defendants would enter an illegal agreement)); *GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 446–47 (N.D. Cal. 2017) ("[W]here a plaintiff's allegations are stuck in 'neutral territory,' i.e., they do not tend to exclude the innocent explanation, such allegations fall short of what *Iqbal* and *Twombly* require.").

from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) (cleaned up); *In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (distinguishing cases that involve weighing two *plausible* alternative explanations on a motion to dismiss).

*Fourth*, Newsmax cannot salvage its case with the claim that "Fox uses other restrictive contract provisions that it has kept hidden." Opp. 26 (citing Compl. ¶¶ 3, 46, 53, 82). That bald assertion of unknown, unspecified contract terms is the epitome of an insufficient threadbare allegation. *Twombly*, 550 U.S. at 557 ("[A] naked assertion of conspiracy in a [Section] 1 complaint . . . stops short of the line between possibility and plausibility." (cleaned up)).

> **2. Even If "Exclusive Carriage" Provisions Were Adequately Alleged, Newsmax's Allegations Describe Nothing More than Exclusive Dealing Arrangements that Do Not Violate Section 1.**
>
> **a. Newsmax fails to plead facts suggesting substantial foreclosure of competition.**

As Fox explained, Newsmax has failed to plead facts plausibly showing any foreclosure—much less *substantial* foreclosure—of competition. Newsmax's responses are meritless.

*First*, Newsmax does not dispute that the complaint fails to identify a single, non-Fox-owned distributor that does not carry Newsmax. *See* Mot. 23. Nor does Newsmax dispute that it is carried by *every* top distributor, including DirecTV, DISH, Hulu+, YouTube TV, Fubo, Sling TV, and Mediacom, *see* Compl. ¶¶ 6, 57, 58, 61, and Comcast/Xfinity, Charter/Spectrum, and Verizon, *see* Dkt. 32-1 at 7. The complaint and Newsmax's SEC filings cited within it squarely admit that Newsmax is carried by every major distributor in the country. Against that backdrop, all Newsmax cites to show supposed "foreclosure" is the allegation that it is not carried in *one package* offered by a *single* distributor (Fubo's Sports/News Package). Opp. 33 (citing Compl. ¶ 57). That is plainly insufficient to show substantial foreclosure of competition. *See In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 865 (N.D. Ill. 2025) ("Substantial foreclosure exists

when 'the opportunities for other traders to enter into or remain in a market are *significantly* limited.'" (cleaned up) (emphasis added)).

*Second*, Newsmax fails to allege any of the facts that would be necessary to assess the degree of foreclosure in the market it has alleged—such as the number of distributors and the number of subscribers reached by each distributor. *See* Mot. 23–24. Alleging that some distributors "refused to do business with" it would not be enough. *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018). Newsmax must *also* "allege how many total [distributors] [a]re in the market in order to establish that [Fox] foreclosed competition," because Newsmax must allege the *share* of the market that is foreclosed. *Id.* Fox explained (Mot. 24) that the viewership numbers cited in the complaint are irrelevant for that purpose. And Newsmax's response confirms that Fox is correct. Newsmax admits (Opp. 35) that "[a]ccess to viewers is what Newsmax cares about." But *access* to viewers is measured by how many distributors carry Newsmax and how many subscribers Newsmax reaches through those distributors. How many subscribers *watch* Newsmax (viewership) does not measure *access* to viewers through the distribution market. *Cf.* Compl. ¶ 72 (citing viewership numbers). Even if Newsmax has unimpeded *access* to viewers—and the allegations in the complaint suggest it does—it could still have low *viewership* numbers because subscribers simply choose not to watch Newsmax. Without allegations about the number of distributors and how many subscribers each of them reaches, Newsmax cannot possibly make out any claim of substantial market foreclosure. Nor can Newsmax solve that problem by trying to amend the complaint with new factual material in its brief. *See* Opp. 35 n.28. In any event, even the new information Newsmax provides—that roughly 15 distributors reach 96% of subscribers—only bolsters Fox's point. Newsmax's alleged exclusion from a single package offered by a single distributor (Fubo) in a market of more than 15

distributors is not sufficient to allege *substantial* foreclosure.

*Third,* Newsmax has no coherent response to the straightforward point (Mot. 24–25) that the short duration of carriage contracts undermines any claim that alleged exclusive contracts could substantially foreclose competition. *See Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163–64 (9th Cir. 1997).[9] Newsmax claims (Opp. 34) that short duration is irrelevant where, as here, "'switching costs' are 'onerous,' and companies cannot 'switch away from the defendant's product to that of rivals.'" But that assertion is nonsensical. There are no switching costs here. Switching costs involve things like the need to purchase new equipment to be compatible with purchasing a different product. *See, e.g.*, *Harley-Davidson*, 151 F.4th at 936–37. The complaint does not allege any costs involved with "switching" to carry Newsmax, nor could it. No new equipment or other expenditures are required for a distributor to carry Newsmax. Nor can Newsmax pretend (Opp. 34) that the "cost" of "switching" to Newsmax is forgoing carriage of Fox News, which distributors cannot give up because they consider it a "must-have" due to strong consumer demand. A distributor's desire to keep purchasing one product to satisfy customer demand for it is not a "switching cost" associated with turning to a competitor.[10] And in any event, the allegations in the complaint itself show that distributors face no binary choice between Fox News and Newsmax, because they can and do carry *both*.

---

[9] As Fox explained (Mot. 24–25), courts routinely hold that exclusive dealing contracts of short duration do not raise concerns for competition. *See Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42 (7th Cir. 1996); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004). Newsmax cannot dismiss those cases on the ground that they involved "competitive markets." Opp. 34. That begs the question. Newsmax must allege facts to plausibly establish some anticompetitive aspect of the market in this case that would prevent Newsmax from securing a contract after any alleged exclusive contract with Fox News expired.

[10] *See, e.g.*, *Omega Env't*, 127 F.3d at 1164 ("[T]hat no distributor would abandon the Gilbarco line for an untested product with no reputation" is an "unremarkable proposition" and not "anticompetitive. It is the essence of competition.").

*Fourth*, Newsmax cannot dismiss the point (Mot. 25–27) that it has alternative avenues other than pay TV for reaching viewers by claiming that Fox "relies on evidence outside the complaint and on cases decided on the merits." Opp. 35. The "evidence outside the complaint" consists of Newsmax's *own* statements to the SEC—in a filing Newsmax *cited in the complaint*, Compl. ¶ 73 n.40—that it can reach viewers via its DTC offering. Mot. 4 n.1 (explaining that the Court can take judicial notice of the Offering Circular). And the cases Fox cites dismissed complaints at the pleading stage, just as here. *See* Mot. 27; *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *9 (N.D. Cal. July 2, 2014) (dismissing antitrust claims where five of sixteen retailers carried plaintiff's product and plaintiff could sell via non-retail channels); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2016 WL 264909, at *5–7 (D. Del. Jan. 21, 2016) (similar).

*Fifth,* unable to allege that it is excluded from carriage, Newsmax shifts (Opp. 34) to arguing that *delays* in securing carriage contracts show *past* foreclosure of competition. But Newsmax's conclusory assertions about supposed delays are also deficient. They are unaccompanied by any facts, such as when Newsmax sought carriage deals with distributors, when carriage deals were concluded, or when Newsmax satisfied the criteria that would have justified a carriage deal. Newsmax thus offers no plausible reason to believe that any "delay" was anything but the result of low demand for Newsmax's product, nor does Newsmax offer any facts to indicate how long supposed delays lasted.[11] In addition, Newsmax alleges delay only with respect to four distributors. *See* Opp. 34 (citing Fubo, Hulu+, Sling TV, and Mediacom); Compl. ¶¶ 58, 60, 61. But as explained above, Newsmax fails to provide any allegations that would allow the Court to infer whether those distributors account for a substantial or insignificant share of the market. A

---

[11] While Newsmax claims in its brief that carriage on Hulu+ and Sling TV was delayed "[f]or nearly a decade," Opp. 5, the complaint claims a "decade" of delay only for Hulu+, *see* Compl. ¶ 58, and even that is a fact-free, conclusory assertion that the Court need not credit.

conclusory allegation that Newsmax had carriage deals "delayed" with four distributors covering an unspecified share of the market for an unspecified period of time is wholly insufficient to plausibly allege substantial foreclosure of competition.

###### b. Newsmax fails to plead injury to competition.

Newsmax also cannot rehabilitate its deficient allegations on injury to competition. Injury to competition requires an injury "to the relevant market," which means "either reduc[ing] output or rais[ing] prices to consumers." *Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019); *see McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1065 (7th Cir. 2019). In addition, not just *any* price increase suffices. Newsmax must plausibly allege consumer prices increased to *supracompetitive* levels. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). The complaint fails to meet those standards.

###### i. Newsmax fails to allege supracompetitive increases to consumer prices.

To start, as Fox has explained (Mot. 29–30), the complaint fails to allege any facts plausibly suggesting an *increase* in any prices. Conclusory allegations of an "increased price" or "higher prices," unaccompanied by facts, are not enough. *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018). Other than such conclusory assertions, however, Newsmax points only to claims that Fox News can charge *more* than other cable news networks. Opp. 28–29. But simply pointing to a price difference for a product that enjoys higher consumer demand, without more, cannot suggest there has been anticompetitive injury to the market.

In any event, Newsmax cites solely data about prices paid by *distributors*, not consumers. *See* Opp. 28 (citing Compl. ¶ 42); Opp. 29 (citing Compl. ¶¶ 42, 53–55, 58). But as Newsmax acknowledges (Opp. 29–30), it must allege an injury that "raise[d] prices *to consumers*." *Chi. Studio Rental*, 940 F.3d at 978 (emphasis added). The complaint is entirely devoid of any

allegations about prices paid by consumers, and vague and conclusory assertions that all charges to distributors are passed along to consumers do not suffice. *E.g.*, Compl. ¶ 71. Instead, Newsmax must allege "what . . . costs increased, how much they increased by, and who experienced the increased costs." *Chi. Studio Rental*, 940 F.3d at 979; *see also, e.g.*, *Spinelli*, 903 F.3d at 212 (allegations of antitrust injury through increased prices insufficient where complaint "cite[d] no examples, data, or other facts to its support [its] assertion"). Newsmax fails to do so.

Lastly, even if Newsmax had alleged *some* increase in consumer prices (it has not), Newsmax plainly fails to meet the requirement that it must allege facts plausibly suggesting prices were raised "above . . . the competitive level." *Roland*, 749 F.2d at 394. Newsmax acknowledges that it must allege supracompetitive prices (Opp. 30), but it points only to conclusory assertions, like the unadorned assertion that "consumers in the Western District face supracompetitive prices." Opp. 30 (quoting Compl. ¶ 19). That is not enough. Newsmax "must provide 'specific factual allegations' that demonstrate harm to competition," and "[c]onclusory allegations of supracompetitive prices are not sufficient." *In re McCormick & Co. v. Pepper Prods. Mktg. & Sales Prac. Litig.*, 275 F. Supp. 3d 218, 225 (D.D.C. 2017) (citation omitted). At a minimum, Newsmax must allege facts "establishing the competitive level above which" Fox's conduct has supposedly "artificially raised prices." *Tempur-Pedic*, 626 F.3d at 1339; *accord Contractor Tool Supply, Inc. v. JPW Indus., Inc.*, 785 F. Supp. 3d 1107, 1117–18 (M.D. Fla. 2025); *OJ Commerce, LLC v. Nat'l Christmas Prods., LLC*, 2025 WL 1510906, at *9 (S.D. Fla. Apr. 25, 2025) (plaintiff must plead enough information to make it "clear" that asserted price changes "qualifie[d] as a price increase 'above competitive levels'" (citation omitted)). Without such allegations, Newsmax fails to plead an injury to competition through increased prices.

### ii.      Newsmax fails plausibly to allege reduction in output.

Newsmax also fails to sufficiently allege injury to competition with assertions about

"reduced consumer choice" and "reduce[d] output." Opp. 28. "Reduced consumer choice" is not part of the injury-to-competition test in the Seventh Circuit, which demands instead that the injury "must either reduce output or raise prices to consumers." *Chi. Studio Rental*, 940 F.3d at 978; *see Inguran, LLC v. ABS Global, Inc.*, 2023 WL 5254780, at *7 (W.D. Wis. Aug. 14, 2023) (Conley, J.). Other circuits also reject "reduced consumer choice" as injury to competition. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (allegations that an agreement "reduc[es] consumers' choices" are "not sufficient to allege an injury to competition").

In any event, the complaint does not even allege facts showing reduced consumer choice. It does not allege that consumers could not watch Newsmax, just that subscribers of one distributor could not watch Newsmax on *that* distributor. *E.g.*, Compl. ¶ 70 (alleging Fox's conduct "left Sling TV's viewers without any choice in the relevant market other than Fox News"). The relevant market includes *all* distributors, however, so Sling TV's subscribers were not limited solely to Fox News—they merely needed to use a different distributor if they wanted to watch Newsmax. The antitrust laws do not guarantee Newsmax 100% carriage on every distributor.

Newsmax's assertions about "reduced output" fare no better. Fox explained (Mot. 31) that Newsmax's allegations of "reduced output" boil down to the claim that Newsmax's carriage on two distributors was delayed. But given that Newsmax alleged there were at least eight other distributors carrying Newsmax's programming, under the Seventh Circuit's reasoning in *Chicago Professional Sports Ltd. Partnership v. NBA*, 961 F.2d 667 (7th Cir. 1992), the delay in carriage on some distributors did not reflect a reduction in output. As the Seventh Circuit explained, as long as NBA games are televised on *one* channel, "there is no reduction in output" simply because the games are not available on multiple channels. *Id.* at 670. In part, Newsmax quibbles that it alleged delayed carriage on *four* distributors (Opp. 30–31), but that distinction is immaterial. Fox's

point still applies.  An alleged delay in securing carriage on a handful of distributors does not reduce output in the market overall where the market includes at least eight other distributors carrying Newsmax's channel with all of its programming.  Newsmax offers nothing to rebut this point or the controlling authority that supports it.

Recognizing its allegations are deficient, Newsmax pivots to a new theory.  Now Newsmax claims the delay in carriage on four distributors meant that Newsmax produced *less programming* and, but for Fox's alleged conduct, Newsmax "would [have] produce[d] more content."  Opp. 31.  The threshold problem with that assertion is that it appears nowhere in the complaint.  Newsmax cites Paragraph 66 (Opp. 31), but that paragraph says nothing of the sort.  It alleges only that Fox discouraged guests from appearing on Newsmax; it does not say a word about Newsmax producing fewer hours of programming.  *See* Compl. ¶ 66.

Once again, Newsmax is trying to salvage its deficient complaint by impermissibly amending its pleadings through its opposition brief.  The Court should ignore Newsmax's newfound assertions, which are insufficient in any event.  To plead reduced output, Newsmax would have to offer more than conclusory assertions that, absent Fox's conduct, there would be "more content."  Newsmax would need concrete factual allegations, for example, that Newsmax previously produced only a limited number of hours of programming *because of* its allegedly "delayed" carriage on four distributors, and that it was only *after* securing carriage on those distributors that it could increase its hours of programming.  Newsmax wholly fails to plead or even identify in its opposition any facts supporting this new theory.

**B.  Newsmax Fails To State a Claim Based on "Drag Down" Provisions.**

**1.  Newsmax Fails Plausibly To Allege that "Drag Down" Provisions Exist.**

Newsmax cannot dispute that the only purported basis in the complaint for alleging the existence of so-called "drag-down" provisions amounts to nothing more than (i) an allegation that,

at most, two distributors do not carry Newsmax in their basic tier (Fubo and Sling TV), and (ii) conclusory allegations that four distributors "delayed" carrying Newsmax for an unspecified period of time. Mot. 32–33. Indeed, while Newsmax asserts that it has adequately alleged such terms exist (Opp. 36), it conspicuously fails to cite any paragraph of the complaint in support. Tacitly conceding the lack of support in the complaint, Newsmax resorts, once again, to attaching new material to its brief. The Court should reject that improper attempt at amendment. *See, e.g.*, *McMahon v. Bumble Bee Foods LLC*, 148 F. Supp. 3d 708, 711 n.2 (N.D. Ill. 2015) (refusing to consider deposition testimony offered for the first time in response to a motion to dismiss).

In any event, the testimony Newsmax attaches is irrelevant. Newsmax claims that so-called "drag down" terms require a distributor to include "Fox Business and Fox Sports 2" in its basic tier if it puts Newsmax in that tier. Compl. ¶ 54. The testimony, however, never mentions Newsmax and describes a different arrangement. It describes "drags" or "drag rights," which are commitments to treat one programmer's channels *of a certain type* at least as favorably as it treats *the same type* of channels from another programmer. Such provisions are designed to ensure parity of treatment for the same type of channel. For example, one witness described a "drag" as a commitment to include a programmer's "kids' content" in any package that "includes competitive kids' networks like Cartoon Network or Nickelodeon." Dkt. 41-6 at 24, Hr'g. Tr. at 881:17–25; *see also id.* at 9, Hr'g. Tr. at 435:10–17 (stating that "drag rights" require that "if a similar channel from a different programmer is carried in a certain package in a certain way," the distributor must carry the programmer's "content in that same package"). Newsmax invents the term "drag-down" to describe a different type of provision that bears no resemblance to what the witnesses in this testimony describe. The so-called "drag-down" terms supposedly require Fox's content of a *different type* (Fox Business and Fox Sports 2) to be included in the basic tier if Newsmax is placed

there.  The testimony does not remotely support the existence of that arrangement.

### 2.       So-Called "Drag Down" Provisions Fail To State a Claim in Any Event.

Even if Newsmax had plausibly alleged that so-called "drag down" provisions exist, they still do not state a claim.  Because the alleged "drag-down" terms are a type of "conditioned" discounting that is *less* restrictive than exclusive dealing (Mot. 34), it follows that where alleged exclusive dealing fails to state a claim, *see supra* Part II.A.2, this arrangement also fails to state a claim.  This failure of pleading is particularly stark given that, as Fox has noted (Mot. 35)—and Newsmax has not disputed—Newsmax alleges there are *at most* two distributors in the whole country (Sling TV and Fubo) that do not carry Newsmax in their basic tier.

Newsmax's responses are unavailing.  Contrary to Newsmax's claims, the Areeda & Hovenkamp treatise does not say that conditioned discounting is treated as a "similar arrangement" to "exclusive-dealing" that causes "competitive harm."  Opp. 37 (citing Areeda & Hovenkamp ¶ 1802).  The cited passage is discussing one of the "preconditions for competitive harm" to arise from "exclusive-dealing"—namely, that the arrangement must "cover[] a significant portion of the downstream market."  Areeda & Hovenkamp ¶ 1802b & n.9 (explaining that "[s]imilar arrangements" would "include vertical ownership").  What the treatise actually says about conditioned discounting is that "discounting policies raise exclusive-dealing concerns in two situations"—when the firm (1) "condition[s] a discount on an exclusive deal," or (2) "offer[s] quantity discounts of such a nature that their effect is to induce customers to take all their requirements for a given product from the defendant."  *Id.* ¶ 1807a.  Newsmax alleges neither situation here.  The alleged drag-down provisions do not involve an agreement not to carry Newsmax *at all*.  *Cf. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) ("Exclusive dealing involves an agreement between a vendor and a buyer

that prevents the buyer from purchasing a given good from any other vendor."). And Newsmax plainly does not allege any sort of "quantity discount." Areeda & Hovenkamp ¶ 1807a.

Next, Newsmax fails to cite *any* case condemning a conditional discount under Section 1. As Fox explained (Mot. 34–35), such arrangements are unobjectionable because a competitor "need only offer a better product or a … better deal to acquire" business. *Allied Orthopedic*, 592 F.3d at 997 (quoting *Omega Env't*, 127 F.3d at 1164). Newsmax cannot distinguish *Allied Orthopedic* on the ground that the defendant was "not a monopolist" or that the competitors there "offered *functionally interchangeable* products." Opp. 37.[12] The court's reasoning did not turn on those points. The court's simple point (as in other cases addressing conditioned discounting) was that discounts did not foreclose competition because competitors needed only to "offer a better product or a . . . better deal" to get business. *Allied Orthopedic*, 592 F.3d at 997 (citation omitted); *accord Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) (rejecting conditioned discounting claim because builders were "free to walk away from the discounts at any time"); *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 612–13, 617 (8th Cir. 2011) (similar). The same rationale applies here. Newsmax needed only to offer a better deal to secure carriage in a distributor's "basic tier," and—as Newsmax alleges—it has done that. *See* Mot. 35 (citing Compl. ¶ 58).

Newsmax ultimately resorts to the irrelevant assertion that "[e]xclusivity discounts" from monopolists force customers to choose between "using *only* the monopolist's product or not using

---

[12] Newsmax's claim (Opp. 37) that the products in the market it has defined are *not* "functionally interchangeable" further undermines its market definition. To the extent Newsmax suggests that there is no substitutability between its product and Fox News—because Fox News is a "must have" product that distributors must carry *in addition to* Newsmax—it simply confirms that Newsmax's deficient market allegations amount to a mistaken attempt to allege a *single-brand* market in which there are no "interchangeable" substitutes for Fox News.

it at all." Opp. 37. That assertion has no bearing on the allegations about purported "drag-down" provisions, because as Newsmax has described them, those provisions do not require distributors to choose between having Fox News or not having Fox News "at all." Instead, they leave distributors free to carry *both* Fox News *and* Newsmax, while providing a price incentive not to carry Newsmax in their basic tier. Once again, moreover, the allegations show that these purported provisions (even if they existed) have been wholly ineffective because Newsmax has alleged that there are *at most* two distributors that have not put Newsmax in their basic tier.

In any event, even if the alleged drag-down terms did amount to exclusive dealing, they would still fail to state a claim for all the reasons above showing that Newsmax has failed plausibly to allege substantial foreclosure of competition or injury to competition. *See supra* Part II.A.2.

## III. Newsmax Fails To State a Claim for Maintenance of Monopoly Power.

Newsmax agrees that, under Section 2, it must plausibly allege (1) Fox's monopoly power in a relevant market, and (2) willful maintenance of that power through exclusionary conduct, resulting in (3) injury to competition. Opp. 37–38. Newsmax's allegations fail on all three prongs.

### A. Newsmax Fails To Allege that Fox Has Monopoly Power in a Relevant Market.

The Section 2 claim fails at the outset because, for all the reasons Fox has explained, Newsmax has failed to adequately plead a relevant market. *See* Mot. 9–19; *supra* Part I.

Newsmax also has not plausibly alleged—through either the direct or indirect method—that Fox has monopoly power. The direct method requires allegations showing "actual detrimental effects on competition . . . such as reduced output, increased prices, or decreased quality.'" *Ducere LLC v. Enbridge (U.S.) Inc.*, 2025 WL 81373, at *4 (N.D. Ill. Jan. 13, 2025) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018)). But Newsmax has not adequately alleged any increased prices or reduced output, *see* Mot. 27–32, *supra* Part II.A.2.b, or "decreased quality," Mot. 29 n.15.

Newsmax does no better on the indirect method, because it has not alleged "possession of

a substantial percentage of the sales in [the] market." *Ducere*, 2025 WL 81373, at *4. Newsmax claims that its bald allegation that "Fox controls about 90% of the right-leaning Pay TV [news] market" is sufficient because "'market share north of 30% allows courts to infer market power'" for a Section 2 claim. Opp. 38 (quoting *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 909 (N.D. Ill. 2023)). But, to begin with, that assertion misrepresents *Deere*, which addressed market power for a Section 1 tying claim, not *monopoly* power under Section 2. The court even went out of its way to explain that "in this context 'market power' doesn't need to reach the level of monopoly power." *Deere*, 703 F. Supp. 3d at 909.[13] For a monopolization claim, "[c]ourts generally require a 65% market share to establish a *prima facie* case of market power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997); *see also Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 n.5 (9th Cir. 2022) (same); *accord United States v. Google LLC*, 747 F. Supp. 3d 1, 134 (D.D.C. 2024).

In any event, Newsmax's market share allegations have other fatal defects. The conclusory assertion that Fox has 90% of viewership in the "right-leaning pay TV news market" (Compl. ¶ 94) is unsupported by any alleged facts, because Newsmax fails to dispute that no one tracks data for that made-up market and instead data is available only for *all* cable news. Compl. ¶¶ 43, 72. A "bare assertion that market share 'exceeds 60%' . . . without any facts" fails to state a claim. *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 2023 WL 6811871, at *9 (D. Or. Oct. 13, 2023); *accord FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) ("[T]he FTC's inability to offer *any* indication of the metric(s) or method(s) it used to calculate Facebook's market share renders its vague '60%-plus' assertion too speculative and conclusory to go forward.").

---

[13] *See generally FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *16 (D.D.C. Dec. 2, 2025) ("monopoly power" and "market power" are "different concepts," and market power "is a far lower bar than *monopoly* power"); Areeda & Hovenkamp ¶ 501.

More important, as Fox explained (Mot. 39), "viewership" does not measure a share in any market, and certainly not the market for "*distribution* of right-leaning pay TV news," Compl. ¶ 68 (emphasis added), which involves transactions between distributors and programmers. Newsmax's only response on that score confirms Fox's point. Newsmax admits (Opp. 35) that "[a]ccess to viewers is what Newsmax cares about" and that "carriage by distributors is *how* Newsmax reaches viewers." That is correct. Access to viewers is a key metric in the distribution market. But *access* to viewers is measured by whether Newsmax has a carriage contract with a distributor and how many subscribers receive Newsmax's channel with their tier of service—not by how many subscribers *watch* Newsmax's channel (viewership). To allege a monopoly in the distribution market, Newsmax would have to allege facts about how many subscribers Fox has access to through its distribution contracts and how many subscribers Newsmax has access to through its distribution contracts and allege that Fox has somehow locked up a monopoly on *access* to viewers. *The complaint is silent on all of that information.* As Fox has explained, Newsmax's conclusory assertions that Fox has "exclusive carriage" terms are not backed up by a single allegation of a distributor that refuses to carry Newsmax. Mot. 21, 24, 27.

And to the extent Newsmax makes vague allegations about "delayed" carriage on four distributors, Newsmax alleges no facts whatsoever to explain what share of the market those distributors cover. As explained, *see supra* p. 15, the complaint is entirely consistent with Newsmax's recent representation to the SEC that it has distribution "on par" with Fox, *see* Dkt. 32-2 at 6, which forecloses any claim that Fox has monopoly power in the distribution market. Newsmax's complaints that viewers (to whom it has *access* through its carriage contracts) have decided not to *watch* its channel (resulting in low *viewership*) are irrelevant to any claim that Fox has a monopoly in the distribution market. Newsmax's mismatched allegations failing to align its

purported "market share" numbers with the market it has alleged are fatal and provide a sufficient ground alone to dismiss the Section 2 claim. *See Spinelli*, 903 F.3d at 212; *Organ Recovery Sys., Inc. v. Pres. Sols., Inc.*, 2012 WL 2577500, at *11 (N.D. Ill. July 4, 2012); *Ducere*, 2025 WL 81373, at *3, *5 (similar).

**B.      Newsmax Fails To Allege Anticompetitive Conduct or Injury to Competition.**

Newsmax also fails to allege that Fox has "willful[ly] maintained" monopoly power through anticompetitive conduct or that such conduct has caused injury to competition. As explained, *see supra* Part II.A–B, alleged exclusive carriage terms and so-called "drag-down" provisions fail to plead anticompetitive conduct for Newsmax's Section 2 claim. *See, e.g.*, *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) ("If . . . a court finds that the conduct in question is *not* anticompetitive under § 1, the court need not separately analyze the conduct under § 2.").

Newsmax cannot lower the bar for itself by invoking a footnote from *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985), to suggest that all it needs to allege is "behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." Opp. 39. It has long been recognized that *Aspen Skiing* is an outlier addressing the unique situation of a concerted refusal to deal—a fact pattern not alleged here. *Aspen Skiing* involves a "limited exception" "at or near the outer boundary of § 2 liability" that applies where a defendant had previously "voluntarily engaged" in a cooperative and profitable "course of dealing with its rivals" but then terminated that course of dealing in a way that can be explained only by a desire to harm competitors. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409

-29-

(2004).  Because Newsmax has not alleged a refusal to deal, *Aspen Skiing* has no application here.[14]

*See Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017).  Indeed, Newsmax fails to cite a single case applying the *Aspen Skiing* footnote as a general test for exclusionary conduct.  To allege exclusionary conduct for its Section 2 claim, Newsmax must allege injury to competition, *Chi. Studio Rental*, 940 F.3d at 978, and it has failed to do that.

Newsmax is also off base complaining about alleged "smear intimidation tactics" directed at Newsmax and its executives.  Compl. ¶ 63.  Such assertions are not cognizable exclusionary conduct because they do not show any injury to competition and at most suggest only injury to Newsmax.  *See Miller v. Nicholas*, 2021 WL 9037639, at *3 (E.D.N.Y. Nov. 3, 2021).  Newsmax cannot rehabilitate those allegations (Opp. 41) by trying to paint them as "part of a 'larger anticompetitive scheme'" like that alleged in *Hytera Commc'ns Corp. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 879–80 (N.D. Ill. 2022).  *Hytera* involved allegations of a campaign of threatening behavior directed *at dealers* to "entice independent dealers to resell and distribute" only the defendant's products and not to carry Hytera's.  *Id.* at 866–67, 878–79.  Newsmax's jumble of conclusory (and unexplained) allegations about unspecified "threats" and the hiring of private investigators directed *at Newsmax* (and its officers) is entirely different.  And Newsmax does not even attempt to allege any connection between these supposed events and any decisions by distributors about carrying Newsmax.[15]

---

[14] *See Qualcomm*, 969 F.3d at 993–94 (*Aspen Skiing* is limited to holding that a company behaves anticompetitively where "(1) it unilaterally terminates a voluntary and profitable course of dealing, (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition, and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers" (cleaned up)).

[15] *Nexstar Broad., Inc. v. Granite Broad. Corp.*, 2012 WL 2838547 (N.D. Ind. July 9, 2012), is inapposite for similar reasons.  The alleged "course of conduct" there also involved "coercive"

Nor can Newsmax rehabilitate the allegations that it impermissibly borrows wholesale from frivolous *pro se* lawsuits by a disgruntled former Fox employee. *See* Compl. ¶¶ 64–65. No amount of rhetoric can obscure the straightforward fact that Newsmax is simply repeating someone else's allegations and throwing out a conclusory assertion that *maybe* something similar happened here. Such allegations are "immaterial within the meaning of Fed. R. Civ. P. 12(f)" and should be stricken. *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009).

## IV. Newsmax's Abandoned Block-Booking Claims Should Be Dismissed.

Newsmax has "voluntarily withdraw[n] its Third and Sixth causes of action for block-booking under federal and state law," Opp. 43, so those claims should be dismissed.

## V. Newsmax's State Law Claims Should Be Dismissed.

Newsmax's state law claims fail for the same reasons as its federal claims. *See* Mot. 47.

## VI. The Complaint Should Be Dismissed with Prejudice.

Newsmax has already tried to plead its antitrust claims against Fox twice. It should not receive a third bite at the apple. Newsmax's first complaint in the Southern District of Florida was dismissed without prejudice. *See* Mot. to Transfer at 2. Instead of accepting the Florida court's invitation to amend that complaint, Newsmax voluntarily dismissed and then filed an essentially identical complaint in this district. In this Court, Newsmax has not moved for leave to amend in its opposition, and it has not shown that any amendment could fix the complaint's "fatal flaws." *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 400–01 (7th Cir. 2006). To the contrary, the new material it attaches to its brief already shows that any amendment would be futile. *See supra* pp. 5–6, 12, 16–17, 23–24; *Haywood v. Massage Envy Franchising*, LLC, 887 F.3d 329, 335 (7th Cir. 2018). The Court should dismiss the complaint with prejudice.

---

conduct directed *at advertisers* to force them "to deal exclusively with [Nexstar]." *Id.* at *8. Newsmax's allegations of conduct *toward Newsmax* are irrelevant.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Dated: February 11, 2025

Respectfully submitted,

Bradley J. Bondi
Michael F. Murray
Benjamin Snyder
Ronald K. Anguas
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, DC 20036
Telephone: 202.551.1700
bradbondi@paulhastings.com
michaelmurray@paulhastings.com
bensnyder@paulhastings.com
ronaldanguas@paulhastings.com

*/s/ Ryan J. Walsh*
Ryan J. Walsh
Amy Miller
**EIMER STAHL LLP**
2 East Mifflin Street
Suite 703
Madison, WI 53703
Telephone: 608.620.8346
rwalsh@eimerstahl.com
amiller@eimerstahl.com

Paul T. Cappuccio
Patrick F. Philbin
Cody L. Reaves
**TORRIDON LAW PLLC**
801 17th Street NW, Suite 1100
Washington, DC 20006
Telephone: 202.249.6900
pcappuccio@torridonlaw.com
pphilbin@torridonlaw.com
creaves@torridonlaw.com

***Attorneys for Defendants***